THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
PARIS LENOIR, Defendant-Appellant.

Fourth District    No. 4—83—0859

Opinion filed June 27, 1984.—Rehearing denied July 25, 1984.

Daniel D. Yuhas and Jane Raley, both of State Appellate Defender's Office, of Springfield, for appellant.

Basil G. Greanias, State's Attorney, of Decatur (Robert J. Biderman and Michael Blazicek, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, Paris Lenoir, was convicted in a bench trial of two counts of armed violence and sentenced to concurrent 10-year terms of imprisonment. The convictions stem from the search of a house in Decatur on August 25, 1983, by State and municipal law enforcement officers. The defendant, a guest in the house, was found alone in a bedroom lying on a bed; beside him were two controlled substances— phencyclidine (PCP) and pentazocine—and a revolver, which was loaded. The defendant argues that the State failed to prove that he knew about or was in possession of these items. The defendant also argues that using a drug-possession offense as the underlying felony for armed violence is inconsistent with the purpose of the armed violence statute. The defendant argues alternatively, and the State concedes, that one of his two convictions must be vacated because they are based on a single offense.

The defendant's bench trial was held October 17, 1983. Gerald Shields, an agent of the Division of Criminal Investigation, Department of Law Enforcement, led the search and arrested the defendant. Shields testified that at about 5 p.m. on August 25 he and eight or nine other officers went to a house at 1415 North Gulick in Decatur to execute a search warrant. Shields was wearing the uniform of an Illinois Bell repairman, and by that disguise he was able to lead his cohort into the house safely after he spoke with an adult female, Jacqueline Green, who answered and unlocked the front door. Inside the house an adult male, Frank Ware, was sitting at a table with two young children; they were eating bowls of chili. Shields found the defendant in a bedroom in the southwest corner of the house. The door to the room was shut, and Shields opened it; his weapon was drawn. The defendant was lying on the bed in a position that enabled him to view a television set, which was on. On the bed with the defendant were a bowl of chili, a .38 caliber revolver, two packs of cigarettes, a television schedule, a small, plastic film container, and

several bags of green, leafy material. The film container held yellow pills, blue pills, and several small bags of white powder. Next to the bed was a night stand, and among the things on it were a plastic bag of blue pills and a pill bottle containing yellow pills; the bag and bottle were inside another plastic bag. Assays of these items showed that phencyclidine was present in the white powder and pentazocine in both groups of yellow pills.

Shield's further search of the bedroom turned up shaving gear on the dresser, several pairs of men's shoes on the floor, and women's clothing and a sawed-off shotgun in the closet. Shields also found a traffic ticket that had been issued to the defendant.

According to Green's and the defendant's testimony, he was asleep in the bed while Green placed first the drugs and later the gun beside him, and he did not wake up until Shields entered the room. Green testified that the defendant, who was her boyfriend at that time, arrived at the house sometime in the morning on the day of the search. After playing with Green's two children for awhile he went to sleep in the southwest bedroom. Green had been watching television in that room, and she left the set on even though the defendant was asleep. When the defendant began his nap neither the drugs nor the revolver was present; Green said that the defendant was on parole then and would not have allowed illicit drugs in the house.

Green testified that at about 3 o'clock that afternoon she made an appointment with someone to obtain drugs for a third person. Green left the house, picked up the drugs, and then returned home. She was in the southwest bedroom, preparing to hide the drugs, when one of her daughters ran in and reported that the other child had hurt herself. Interrupted in her task, Green left the drugs on the bed and night stand.

Green explained that the gun that was found next to the defendant had come from a pot in the kitchen. She said that she keeps weapons hidden throughout the house, and that this particular gun turned up in the pot that she was going to use to prepare the chili. She laid the gun next to the defendant on the bed. Later, she took a bowl of chili in to the defendant, who was still asleep. Green was impeached: she pleaded guilty to forgery just the week before she testified, apparently in a plea agreement involving charges from the events here, and in March 1983 she was convicted of misdemeanor theft.

The defendant testified. He said that his residence was in Chicago and that on occasion he stayed overnight with Green at her house in Decatur. The defendant explained that on August 25 he arrived at

Green's house at about 1 o'clock in the afternoon. He had come from Chicago that day with Frank Ware, the other man that the police found in the house. The defendant was tired, and on his arrival he retired to the bedroom to rest. He lay on the bed and watched television until he fell asleep. He woke up to find Shields standing in the doorway. The defendant said that he did not notice the bowl of chili when he woke, and that the gun and drugs were not present when he went to sleep. The defendant was impeached with his conviction for attempted burglary, which he had pleaded guilty to in · September 1982.

The trial judge found the defendant guilty of the two counts of possession of a controlled substance and the two counts of armed violence. The judge said that he did not believe the defendant's or Green's testimony, and he said specifically that Green's account was incredible and that he had disregarded it entirely. The trial judge later vacated the convictions for the underlying felonies and sentenced the defendant to concurrent 10-year terms of imprisonment for the two convictions for armed violence, Class X felonies here because the defendant was armed with a firearm.

The defendant argues first that the State failed to prove his guilt for the offenses beyond a reasonable doubt. With respect to the controlled substances, the defendant points out that they were found in closed, opaque containers and argues that the State did not prove his knowledge of what those containers held. The defendant also argues that the State failed to prove his possession, actual or constructive, of the drugs, and he emphasizes a number of circumstances that may indicate his innocence: he was merely a visitor in the house, the drugs were not on his person, and he did not grab them or attempt to exercise any control over them when Shields entered the room. With respect to the gun, the defendant argues that the State failed to prove his knowledge of its presence, and he emphasizes that it was not on his person. The defendant also points out that his and Green's testimony went uncontradicted.

■■ ■ It should be noted at the outset that the version of events related by Green and the defendant went uncontradicted only in the sense that no one else provided direct evidence of what occurred in the bedroom before the search began. The trial judge said that he did not believe their testimony, and he found Green's to be incredible. This was in keeping with the common-sense principle that the trier of fact may reject testimony simply because it is incredible and unbelievable, for "when a defendant elects to explain his presence at the scene of an offense it is incumbent upon him to tell a reasonable story or be

judged by its improbabilities. [Citations.]" *(People v. Morehead* (1970), 45 Ill. 2d 326, 330, 259 N.E.2d 8, 10.) This would apply with equal force to the testimony of a witness who is not a party to the action. Thus, the reason for rejecting or disregarding a witness' testimony may be found in the testimony itself rather than in the contradictions posed by conflicting testimony. Its only effect is destructive, however, and it cannot be used to supply deficiencies in the State's case. *(People v. Holsapple* (1975), 30 Ill. App. 3d 976, 333 N.E.2d 683; see *People ex rel. Brown v. Baker* (1981), 88 Ill. 2d 81, 430 N.E.2d 1126.) The burden is on the State to prove every element of the offense beyond a reasonable doubt. *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068.

To sustain the charges of unlawful possession the State was required to prove the defendant's knowledge that the substances were present and his actual or constructive possession of them *(People v. Calhoun* (1977), 46 Ill. App. 3d 691, 361 N.E.2d 55), in addition to the identity of the substances, which is not in dispute here. The substances were found in a film container and a pill bottle, and both of these were opaque and closed. The defendant cites *People v. Binns* (1975), 27 Ill. App. 3d 978, 327 N.E.2d 369, reversing a conviction for possession of cannabis, which the police had discovered in the defendant's apartment in several closed manila envelopes. The appellate court found insufficient evidence that the defendant knew what was in the envelopes. This result rested in part on one unusual, remarkable aspect of the case: the testimony of a 15-year-old neighbor, given in the defendant's behalf, that he had framed the defendant as an act of revenge by planting the envelopes in the apartment and then notifying the police.

The defendant also argues that the State failed to prove his possession, actual or constructive, of the drugs. He was a visitor in the house, the drugs were only near him, not on his person, and he did not exercise any control or dominion over them. The defendant cites *People v. Pugh* (1967), 36 Ill. 2d 435, 223 N.E.2d 115, which reversed a conviction for possession of narcotics because of insufficient evidence of possession. The defendant there was found lying in bed in a bedroom, and he said that he was a visitor rather than a resident. The narcotics were discovered behind a hinged molding in the bedroom. As a visitor, then, the defendant could not be found in possession of items hidden in the place that he was visiting, without more.

With respect to the revolver, the defendant argues that although it was found within a foot of him on the bed, the State failed to prove that he knew that it was there. The armed violence statute does not

contain a mental state, but the State does not dispute that knowledge would be the appropriate one here.

These arguments must be rejected. The defendant was found alone in a bedroom with the door shut. The arresting officer believed that the defendant was watching television and therefore was awake. Around the defendant on the bed and within his reach were a number of small items, including food, a loaded gun, bags of a green, leafy material, and the film container. Next to the defendant on the night stand was the pill bottle. These circumstances support the inferences that the defendant was in possession and control certainly of the items on the bed, and that he knew what was there. Shields found the television set on and the defendant awake, as if he was watching television, and the trial court properly disregarded the testimony that the defendant was asleep while first drugs, then a gun, and finally a bowl of chili were placed next to him on the bed.

The defendant's two convictions for possession of a controlled substance were Class 4 felonies and became armed violence because of the presence of the firearm. The armed violence statute provides:

> "A person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law." (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2.)

The dangerous weapon here was a firearm, a Category I weapon under the statute, making the offense a Class X felony. Ill. Rev. Stat. 1983, ch. 38, par. 33A—3.

The defendant argues that the possession offenses should not be used as the underlying or predicate felonies. The defendant correctly observes that although the literal language of the statute would permit its enhancement of every felony, the supreme court has narrowed the scope of the statute by finding several exceptions to it: neither unlawful restraint *(People v. Wisslead* (1983), 94 Ill. 2d 190, 446 N.E.2d 512), nor voluntary manslaughter *(People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48) may serve as the predicate felony. Furthermore, double enhancement is not permitted, so any offense already containing as an element the use of a weapon cannot serve either. *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627.

The defendant argues that the legislature intended to enhance only those felonies that are violent or potentially violent and that the possession of drugs is victimless crime. The defendant then goes on to argue that possession is a continuing offense and that allowing it to be enhanced under the armed violence statute may lead to absurd results: the weekend hunter who is in constructive possession of a controlled substance that is at home is therefore guilty of armed vio-

lence while he is out in the woods. The defendant does not couch these arguments in constitutional terms but relies instead on what he thinks is a fair reading of the statute and what it requires.

The State initially responds that this question has been waived because it was not posed in the trial court. At no time did the defendant question the application of the armed violence statute to drug-possession offenses. Even if the defendant's argument was a constitutional one, it could be considered waived. (*People v. Amerman* (1971), 50 Ill. 2d 196, 279 N.E.2d 353.) We choose instead to address the defendant's argument.

In *Wisslead* the defendant was charged with unlawful restraint and, because he allegedly had a weapon at that time, armed violence based on the unlawful restraint. The trial court agreed with the defendant that applying the armed violence statute to unlawful restraint was unconstitutionally disproportionate. The supreme court affirmed. The argument there depended on comparing unlawful restraint with a greater felony, kidnaping. Kidnaping is more serious than unlawful restraint and accordingly is punished more severely. But unlawful restraint committed with a firearm becomes armed violence, a Class X felony, and kidnaping committed with a firearm may constitute aggravated kidnaping, which is only a Class 1 felony. The classification of the offense therefore was unreasonable, and the court held that armed violence could not be predicated on unlawful restraint. The court also noted a similar disproportionality with another greater offense, forcible detention, a Class 2 felony that is committed with a weapon.

Here, the defendant has not attempted to show that an offense that is more serious than simple possession is, when enhanced with a weapon, punished less severely than the armed violence conviction here. Therefore *Wisslead* shows the existence of exceptions to the armed violence statute but is not otherwise of benefit here.

In *Alejos* the court held that armed violence could not be predicated on voluntary manslaughter. Unlike *Wisslead*, the basis for the decision in *Alejos* was not constitutional; rather, the court looked to the purpose of the armed violence statute and the nature of voluntary manslaughter. Voluntary manslaughter is by definition unpremeditated, the court said, and would not be deterred by the armed violence provisions. Thus, using voluntary manslaughter as the predicate for armed violence had no relation to the purpose of the armed violence statute, and the court held that voluntary manslaughter could not be enhanced in that way.

■ ■ Armed violence does not require use of the weapon; its

mere presence is sufficient. (*People v. Haron* (1981), 85 Ill. 2d 261, 442 N.E.2d 627.) The deterrent purpose of the armed violence statute, which depends on punishing felons who carry weapons more severely than felons who do not, was relevant here, even though the underlying felony was possessory rather than violent. Law enforcement officers and ordinary citizens all have an interest in seeing that persons who are committing felonies do not have weapons about them. The underlying offense of possession is not consistent with or unrelated to the purpose of the armed violence statute, as was the case in *Alejos*.

The defendant's suggested absurd results—the weekend hunter with the drugs at home—are merely hypothetical instances and are not at all like the case here. At any rate, those results are severe rather than absurd and are in accordance with the purpose of the statute. The potential danger to the public that is posed by an armed felon does not necessarily depend on his actual possession of a substance; that danger may exist long distance, as in the defendant's hypothetical.

██ Finally, the defendant argues and the State concedes that under *People v. Manning* (1978), 71 Ill. 2d 132, 374 N.E.2d 200, one of the two convictions for armed violence must be vacated: only one offense occurred, even though two substances were present. Therefore, we vacate one conviction and affirm the other.

Affirmed in part and vacated in part.

MILLS, P.J., and TRAPP, J., concur.