No. 2--04--0905                    filed: 4/11/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03--CF--3312 |
| ANTONIO L. ANDERSON, | ) ) ) | Honorable Richard W. Vidal, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court**:**

Defendant, Antonio L. Anderson, appeals his conviction of armed violence predicated on possession with intent to distribute a look-alike substance (720 ILCS 5/33A--2(a) (West 2002); 720 ILCS 570/404(b) (West 2002)).  Defendant argues: (1) the predicate felony was not proved because the substance he possessed could not reasonably be mistaken for crack cocaine as was charged in the indictment; and (2) armed violence was not proved because he discarded his gun before the police arrested him.  We reject defendant's arguments and affirm.

BACKGROUND

Defendant's case was tried to the bench.  Many of the facts are undisputed.  On November 13, 2003, Officers Jeffrey Koehn and Randy Berke drove to the Jane Addams Housing Project in Rockford in response to a report that a black man wearing all black clothing had been seen discharging a firearm.  The officers were wearing plainclothes and driving an unmarked car.  When they arrived at the scene, the officers saw a black man, dressed entirely in black, duck down behind a

wooden fence.  The man was later identified as defendant.  Upon seeing defendant, the officers stopped their car, stepped out, and identified themselves to defendant as police officers, at which point defendant fled into the courtyard of the housing development.  The officers pursued.  As defendant ran, he threw a gun down near a fence.  The officers had not seen the gun in defendant's possession before this time. After throwing the gun, defendant ran about 25 feet farther before he stopped and surrendered to the officers.  Officer Koehn restrained defendant while Officer Berke immediately ran back and found the gun that defendant had thrown down.  Officer Berke remained with the gun, a semiautomatic pistol, until additional officers arrived, one of whom retrieved the gun and processed it as evidence.  No ammunition was found with the gun nor were any shell casings found in the area where defendant was arrested.  The gun was dusted for fingerprints but none were found.

While Officer Berke was guarding the gun, Officer Koehn arrested defendant.  A search of defendant's person revealed several baggies.  Some of the baggies contained a plant-like substance that later tested positive for the presence of cannabis.  The eight remaining baggies contained an off-white, chunky substance.  When Officer Koehn discovered these baggies, defendant said, "That's just peanuts, man."  The material did not test positive for any illegal substance.  The lab technician who tested the material described it as a "loose chunky substance."

Defendant was taken into custody and interviewed.  He repeatedly denied "[knowing] anything about a handgun" and suggested that the gun found by the officers might have been related to the many shootings that had recently occurred in the housing development.  Defendant stated that the off-white, chunky substance found in his possession was actually peanut pieces that he had taken from his aunt's bag of trail mix with the design of selling them as crack cocaine at the housing

development. Defendant said that he began his attempts to sell the substance earlier on the day of his arrest and that his attempts were unsuccessful.

Officer Koehn testified that he has experience in drug interdiction. He testified that, upon first seeing the off-white, chunky substance, he "immediately formed an assumption that it was crack cocaine." When shown the substance at trial, Officer Koehn continued to opine that it resembled crack cocaine. Officer Koehn explained that his opinion was based on both the "appearance" of the substance and its "packaging," which were consistent with how crack cocaine is packaged.

Over defendant's objection, the trial court recognized Officer Berke as an expert in the field of narcotics trafficking. Officer Berke testified that the number of baggies in defendant's possession containing the off-white, chunky substance was inconsistent with personal use of crack cocaine because "a user will not purchase eight individual bags [of crack cocaine] at a time."

After the State rested, defendant testified. He stated that he was at his aunt's house in the afternoon on the day of his arrest. He took peanuts from his aunt's trail mix and placed them into eight individual baggies. Defendant identified the baggies in evidence as the ones he packed the day of his arrest. Defendant testified that he went from his aunt's house to the Jane Addams Housing Project, where he attempted to sell the peanuts as crack cocaine. Defendant testified that "[d]ue to the color [of the peanuts], no one would buy from me." After about an hour of failed solicitation, defendant went to a friend's house. On the way home, he passed through the Janes Addams development again. As he was walking, he saw a car approach with two men inside. Defendant did not recognize the men and did not know they were police officers. When the men shouted at him, he ran because the car the men were driving was similar to cars owned by people with whom he was not on good terms. The men chased him. Defendant did not hear them identify themselves as police officers. As defendant ran, he encountered uniformed police officers who ordered him to lie down

on the ground, and he complied. Defendant testified that he had already given up any intention of selling the fake crack cocaine when the police encountered him. Defendant denied that he carried any type of firearm on the day of his arrest.

In rebuttal, the State called Officer Koehn, who testified that the first thing he and Officer Berke did as they exited their car upon encountering defendant was to identify themselves as police officers. Officer Koehn testified that he and Officer Berke used clearly audible voices. When they called out to defendant, he began to run.

The trial court convicted defendant of armed violence predicated on possession with intent to deliver a look-alike substance. Defendant was sentenced to 15 years' imprisonment. The trial court denied his motion for a new trial, and defendant filed this timely appeal.

ANALYSIS

On appeal, defendant argues that he was not proved guilty of possessing a look-alike substance or of armed violence. Defendant argues that the facts relevant to both issues are undisputed and therefore we should review the trial court's determinations de novo. We initially agreed with defendant, which prompted the State to file a petition for rehearing asking us to reevaluate our position. We had the parties address whether and when a criminal conviction is reviewable de novo. The State claims that de novo review of a criminal conviction is restricted to questions of statutory interpretation. Defendant argues that de novo review extends as well to the application of criminal statutes to undisputed facts. Defendant's view finds vindication in the decisions of our supreme court, where de novo review has been applied not just to the question of whether a statute was properly construed but also to whether the statutory elements were satisfied by the undisputed facts. See In re Ryan B., 212 Ill. 2d 226, 231 (2004); People v. Smith, 191 Ill. 2d 408, 411-13 (2000); People v. Lamborn, 185 Ill. 2d 585, 590 (1999).

For example, in Lamborn, the defendant argued that the photographs found in his possession did not meet the definition of child pornography under the Illinois statutes. The court framed the issue as purely a question of law, involving the meaning of "lewd exhibition" in the applicable statute. Lamborn, 185 Ill. 2d at 590, quoting 720 ILCS 5/11--20.1(a)(1)(vii), (a)(6) (West 1996). The court explained:

"We must review the photographs themselves and determine whether those photographs are lewd under the child pornography statute. We are not faced with reviewing the sufficiency of the evidence. Therefore, the de novo standard of review is the correct standard of review for this appeal." Lamborn, 185 Ill. 2d at 590.

The supreme court proceeded to define "lewd exhibition" and to determine whether the photographs met that definition. The court reviewed both issues de novo. Justice Heiple dissented, accusing the majority of confusing the standards of review:

"The majority is undoubtedly correct that this court will review questions of statutory construction, such as the meaning of the term 'lewd exhibition' in the child pornography statute, under a de novo standard of review. [Citation.] The de novo standard of review, however, is completely inappropriate when this court reviews the sufficiency of the evidence in a child pornography case. No statute has been cited which requires interpretation by this court. Once the trier of fact makes a factual determination that the photographs in question depict the victims in poses which focus on their breasts and buttocks and are obviously intended to excite sexual desire, this court has no authority to substitute its own judgment for that of the trier of fact. [Citation.] Rather, this court, as a court of review, must view the evidence in the light most favorable to the prosecution and determine whether any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" Lamborn, 185 Ill. 2d at 599-600 (Heiple, J., dissenting).

Later, in People v. Smith, 191 Ill. 2d 408 (2000), the supreme court was asked to determine whether the defendant committed armed violence based on simultaneous possession of a gun and drugs even though he threw the gun out of his apartment window as the police approached on the street to execute a search warrant at his apartment. Observing that the facts were not in dispute, the court characterized the defendant's guilt as "a question of law, which we review de novo." Smith, 191 Ill. 2d at 411. The court's subsequent analysis consisted of determining whether the defendant's conduct met the statutory elements of armed violence. Smith, 191 Ill. 2d at 412-13; see also In re Ryan B., 212 Ill. 2d 226, 231 (2004) ("Because respondent's challenge to the sufficiency of the evidence against him does not question the credibility of the witnesses, but instead questions whether the uncontested facts were sufficient to prove the elements of sexual exploitation of a child, our review is de novo").

According to the supreme court, where there is no dispute in the underlying facts, a criminal conviction may be reviewed de novo; otherwise, the conviction should not be reversed unless no rational trier of fact could find the elements of the crime proved beyond a reasonable doubt. This approach raises some interesting questions. The first concerns what difference, if any, there should be in the degree of deference between a case where the conviction is based on a particular set of stipulated facts and a case where, though the facts are contested, the trial court adopts the same set of facts after resolving conflicts in the testimony. Say, for example, that the conviction in Case One is based on a set of stipulated facts called Set A. On appeal, the defendant argues that the undisputed facts in Set A do not establish his guilt. In Case Two, the trial court is presented with Set A again

but, as this is a contested trial, Set B, a conflicting set of facts, is presented as well. The trial court weighs the testimony, resolves the conflicts, and accepts Set A. On appeal from the conviction in Case Two, the defendant argues that the trial court should have accepted Set B. The reviewing court defers to the trial court's resolution of the conflict and takes Set A as the underlying facts. It seems, then, that the reviewing court is in the same posture in both Case One and Case Two, and de novo review would be as appropriate in Case Two as in Case One despite the fact that the evidence in Case Two was in conflict.

Second, the supreme court's approach raises the question of just what manner of factual conflict triggers deferential review. If the only factual conflict in the evidence has no consequence for the ultimate question of guilt or innocence, must that conflict dictate deferential review? For example, in Smith, the undisputed facts were as follows:

"[P]olice officers testified that they executed a search warrant at defendant's apartment on June 22, 1994. As police approached the apartment building, they saw defendant drop a handgun out of the apartment window. The gun slid down the roof of the building's porch and onto the ground, where police recovered it. The gun was not loaded. In the living room of the apartment, police found 2.5 grams of cocaine behind a couch and 2.1 grams of cannabis on a coffee table. Defendant was found in the bedroom near a window, the screen of which had been pushed outward. No other persons were found in the apartment, and no ammunition was discovered." Smith, 191 Ill. 2d at 410.

The supreme court reversed the defendant's conviction of armed violence "because he dropped the gun out of the window as soon as he became aware that police were approaching," and thus "exhibited no propensity to violence." Smith, 191 Ill. 2d at 412-13.

If the defendant had testified and, contrary to the police's account, claimed that he discarded the gun before he saw the police approach, there would have been a factual conflict over the timing of his disarming. Would that conflict have required the court to adopt the deferential "rational trier of fact" standard rather than the de novo standard? If so, would the result have been different, thus giving criminal defendants an incentive in some cases to abandon their versions of the facts in order to obtain less deferential review of their convictions?

These are questions for another case. Here, the parties raise no issue about the standard of review applicable to the armed violence conviction; both agree that de novo review is appropriate. They do disagree, however, over whether the conviction of possession of a look-alike substance should be reviewed de novo. We agree with the State that the evidence underlying that conviction presents a factual dispute about the likeness to crack cocaine of the substance found in defendant's possession. The officers testified that the appearance of the substance was consistent with crack cocaine. The State asserts that this testimony was at odds with defendant's claim that he had no success in selling the substance at the housing development because of the "color" of the substance. (Defendant, we note, did not himself opine about the similarity of the substance to crack cocaine.) Thus, the State concludes, the trial court had to weigh the officers' testimony that the appearance of the substance was like crack cocaine against defendant's claim that certain individuals at the housing project had rejected that substance because it did not have the color of crack cocaine. We agree with the State that the trial court was called on to weigh conflicting opinions about the substance's similarity to crack cocaine. On appeal, defendant does not concede the truth of the officers' testimony about the appearance of the substance but continues to claim that the substance did not look like crack cocaine. Therefore, given this factual conflict, the supreme court's holdings in Ryan

B., Lamborn, and Smith dictate that we review the trial court's determination to see whether any rational trier of fact could find defendant guilty beyond a reasonable doubt of possessing a look-alike substance.

As noted, the State's theory at trial was that the substance in defendant's possession looked like crack cocaine. The trial court agreed with the State, citing People v. Cochran, 323 Ill. App. 3d 669 (2001), and relying on "the lab technician's testimony as to the appearance of the substance, the arresting officer's opinion that it was cocaine-like material, the matter of packaging, the color of the material, the amount and, of course, the admissions by the defendant as to his course of conduct in attempting to sell the material." Section 102(y) of the Illinois Controlled Substances Act (Act) (720 ILCS 570/102(y) (West 2002)) provides in relevant part:

> " 'Look-alike substance' means a substance, other than a controlled substance which (1) by overall dosage unit appearance, including shape, color, size, markings or lack thereof, taste, consistency, or any other identifying physical characteristic of the substance, would lead a reasonable person to believe that the substance is a controlled substance, or (2) is expressly or impliedly represented to be a controlled substance or is distributed under circumstances which would lead a reasonable person to believe that the substance is a controlled substance. For the purpose of determining whether the representations made or the circumstances of the distribution would lead a reasonable person to believe the substance to be a controlled substance under this clause (2) of subsection (y), the court or other authority may consider the following factors in addition to any other factor that may be relevant:

(a) statements made by the owner or person in control of the substance concerning its nature, use or effect;

(b) statements made to the buyer or recipient that the substance may be resold for profit;

(c) whether the substance is packaged in a manner normally used for the illegal distribution of controlled substances;

(d) whether the distribution or attempted distribution included an exchange of or demand for money or other property as consideration, and whether the amount of the consideration was substantially greater than the reasonable retail market value of the substance."

Officer Koehn testified that, based on his experience in drug interdiction, he believed that the substance was crack cocaine upon first seeing it, given its off-white color and chunky texture.  He continued to believe at trial that the appearance of the substance was consistent with crack cocaine.  Officer Berke, testifying as an expert in the field of narcotics trafficking, opined that the packaging of the substance was consistent with the packaging of crack cocaine.  "[T]he officers' involvement in prior drug transactions was exactly the kind of experience called for to determine what a reasonable person in the context of a drug transaction would be led to believe regarding the substance." Cochran, 323 Ill. App. 3d at 679.  Though its appearance and packaging were sufficient in themselves to establish the substance as a look-alike substance under clause (1) of section 102(y) of the Act, there is the additional fact, relevant under clause (2), that defendant represented the substance as crack cocaine at the housing development.

Defendant raises several points that he believes militate against finding that the substance was a look-alike substance. Defendant notes that people at the housing development refused to believe the substance was crack cocaine due to its color, and, moreover, neither Officer Berke nor the forensic scientist who tested the substance offered an opinion on whether the color and consistency were consistent with crack cocaine. These points are not persuasive. First, the opinions of people whose identities and experience in contraband are unknown hardly undermine the opinions of the officers with experience in drug interdiction who testified at trial. While it is true that neither Officer Berke nor the forensic scientist gave any opinion based on the appearance of the substance, Officer Berke did testify about the packaging of the substance, and his opinion, coupled with Officer Koehn's insistence that the substance resembled crack cocaine in color and consistency, was sufficient to establish that a reasonable person could believe that the substance was crack cocaine.

Defendant's next contention is that Officer Koehn testified only to the packaging of the substance, not its appearance. Defendant misreads the officer's testimony. Officer Koehn testified that the "off-white rock-like substance" he seized from defendant resembled crack cocaine in both "appearance" and "packaging." Defendant also considers it telling that Officer Koehn field-tested the substance for the presence of a controlled substance even after defendant informed him that they were "just peanuts, man." Defendant suggests that Officer Koehn should have known better, that "common sense dictates that a reasonable person would be able to distinguish between the physical characteristics of peanuts and those of crack cocaine." We doubt that "common sense" has much to say about the appearance of crack cocaine--at least, not more than an officer experienced in

drug interdiction could say. Officer Koehn's initial impression that the substance was crack cocaine is actually a compliment to defendant's ability to pass off a phoney substance as real and undergirds the finding that the substance was indeed a look-alike substance under the Act.

Defendant attempts to distinguish this case from Cochran, cited by the trial court. In Cochran, the defendant was found in possession of an off-white, chalky, rock-like substance and was charged with possession of a substance that looked like crack cocaine. The defendant testified that he purchased the substance from an unidentified male. After purchasing the substance, the defendant tasted it and thought it was just " 'some kind of grain.' " Cochran, 323 Ill. App. 3d at 672. The arresting officers testified, based on their experience in drug interdiction, that the appearance of the substance was very similar to crack cocaine. The appellate court affirmed the defendant's conviction of possession of a look-alike substance. Cochran, 323 Ill. App. 3d at 679-80.

Defendant notes that the substance in Cochran was authentic enough in appearance that it actually was sold as crack cocaine, unlike the substance in this case. Also, defendant observes, the substance in Cochran so resembled crack cocaine that the defendant felt the need to taste it before making his final judgment about its authenticity. These differences between Cochran and this case are not determinative. The testimony of Officer Koehn and Officer Berke was sufficient to establish that a reasonable person could believe that the substance in defendant's possession was crack cocaine.

Defendant's next argument is that he was not proved guilty of armed violence. A person commits armed violence when he commits any felony, other than certain felonies not applicable here, "while armed with a dangerous weapon." 720 ILCS 5/33A--2(a) (West

2002). A person is considered "armed with a dangerous weapon" when "he or she carries on or about his or her person or is otherwise armed" with a handgun. 720 ILCS 5/33A-- 1(c)(1), (c)(2) (West 2002). Defendant does not dispute that he possessed a gun when the officers first encountered him. Rather, he argues that, because he was no longer in possession of the gun at the time of his arrest, he could not be considered "armed with a dangerous weapon."

The parties disagree over the proper reading of the phrase "armed with a dangerous weapon." This is an issue of statutory construction that we review de novo. People v. Harris, 203 Ill. 2d 111, 116 (2003). Our review requires us to analyze the following cases: People v. Condon, 148 Ill. 2d 96 (1992), People v. Harre, 155 Ill. 2d 392 (1993), People v. Smith, 191 Ill. 2d 408 (2000), and People v. Neylon, 327 Ill. App. 3d 300 (2002).+

In Condon, the police executed a search warrant at the defendant's house. The defendant was in his kitchen when the police found him. Firearms were found in various parts of the house but not on the defendant's person or in the kitchen. Controlled substances were also found in the house. The defendant was convicted of armed violence predicated on possession and delivery of a controlled substance. In reviewing his conviction, the supreme court construed the armed violence statute as follows:

"The intended purpose of the armed violence statute is to deter felons from using dangerous weapons so as to avoid the deadly consequences which might result if the felony victim resists. [Citation.] ***

A felon with a weapon at his or her disposal is forced to make a spontaneous and often instantaneous decision to kill without time to reflect on the use of such deadly force. [Citation.] Without a weapon at hand, the felon is not faced with such

a deadly decision. Hence, we have the deterrent purpose of the armed violence statute. Thus, for this purpose to be served, it would be necessary that the defendant have some type of <u>immediate access to</u> or <u>timely control over</u> the weapon." (Emphasis in original.) <u>Condon</u>, 148 Ill. 2d at 109-10.

The court reasoned that, because the defendant neither possessed nor had immediate access to a gun when the police entered his house, but rather all the guns were in other rooms of the house, "[t]he danger that the defendant would be forced to make an instantaneous decision to use the guns was nonexistent." <u>Condon</u>, 148 Ill. 2d at 110. The court also found no evidence that the defendant possessed a firearm during the underlying felony of delivery of a controlled substance. Furthermore, the court refused to find the defendant guilty of armed violence based on simultaneous possession of the controlled substances and the firearms:

"*Such a finding reaches too far. Were we to find the presence of guns in the house with the cocaine enough to violate the armed violence statute, such a finding would be contrary to the purpose for which the statute was enacted. Rather, we find that defendant would have had to carry a weapon on his person or alternatively to have had immediate access to or timely control over a weapon when the police entered to have been otherwise armed for purposes of the statute. <u>Condon</u>, 148 Ill. 2d at 110.*

The supreme court reversed the defendant's conviction of armed violence. As we read <u>Condon</u>, a conviction of armed violence must be based on evidence that the defendant was armed with a dangerous weapon at a point where there was the immediate potential for violence, such as during a drug transaction or during a confrontation with police. A defendant's mere possession of drugs and a weapon simultaneously, where the weapon is

˅14˅

not immediately accessible to him (as by being in a different room of the house, e.g., Condon), cannot sustain a conviction of armed violence.

The supreme court cleaved to these principles in Harre. There, the police were executing a search warrant at the defendant's residence when they saw a car approach up the long driveway of the house. The car stopped at a gate, and the police heard a car door open and close and the sound of the gate being opened. The car came the rest of the way up the driveway with the defendant riding on the hood of the car near the front passenger door. The front passenger window was half open. The car stopped at the residence, and the defendant jumped down from the hood and took two steps toward the passenger door, apparently to open it. The police, with weapons drawn, identified themselves, and the defendant obeyed their directive to place his hands on the hood of the car. He was arrested, and firearms were found on the front passenger seat. Controlled substances were found in the trunk. The defendant was convicted of armed violence predicated on drug crimes. Harre, 155 Ill. 2d at 394-95. The supreme court upheld the conviction, noting that, unlike in Condon, there was evidence that the defendant had direct access to firearms, given his proximity to the guns on the passenger seat as he sat on the car's hood. Harre, 155 Ill. 2d at 400. In further contrast to Condon, the court observed, there was evidence that the defendant possessed a gun during a drug delivery, as the circumstances "supported the inference that defendant had moments before his apprehension been riding in the car on his way to a drug delivery with a weapon inches from his grasp." Harre, 155 Ill. 2d at 400. Finally, the court rejected the defendant's contention that, because he had abandoned his intent to open the passenger door before he was arrested, he could not be guilty of armed violence:

"[T]he determination of whether a defendant is armed is not made at the moment of arrest. Rather, armed violence occurs if a defendant commits a felony while having on or <u>about</u> his person a dangerous weapon or if a defendant is <u>otherwise</u> armed. We would completely eviscerate the deterrent purpose of the armed violence statute if we were to require police officers to wait to announce their presence and effect an arrest until a defendant's access and control over a readily available weapon had ripened into the temptation to take actual physical possession, which would invite rather than deter violence." (Emphasis in original.) <u>Harre</u>, 155 Ill. 2d at 401.

In <u>Smith</u>, the police executed a search warrant at the defendant's apartment. As they approached the building, the defendant dropped a handgun out of his apartment window. The gun slid down the roof of the building's porch and onto the ground, where the police recovered it. The police then entered the apartment, finding the defendant in a bedroom and contraband in the living room. Following the reasoning of <u>Condon</u>, the supreme court reversed the defendant's conviction of armed violence:

"Defendant did not have ' "immediate access to" or "timely control over" a weapon when the police entered' (<u>Condon</u>, 148 Ill. 2d at 110), because he dropped the gun out of the window as soon as he became aware that police were approaching. *** Permitting an armed violence conviction to stand against a felon such as defendant, who exhibited no propensity to violence and dropped the unloaded gun out of the window as the police approached his apartment to search for drugs, would not serve, but rather would frustrate, the statute's purpose of deterring criminals from involving themselves and others in potentially deadly situations." <u>Smith</u>, 191 Ill. 2d at 412-13.

The holding drew the dissents of Justices Miller and McMorrow. See Smith, 191 Ill. 2d at 416-18 (Miller, J., concurring in part and dissenting in part, joined by Freeman and McMorrow, JJ.), 419-21 (McMorrow, J., concurring in part and dissenting in part, joined by Miller and Freeman, JJ.). Justice Miller quoted the supreme court's prior observation that the armed violence statute was passed by the legislature to address the reality that " '[t]he presence of a weapon enhances the danger that any felony that is committed will have deadly consequences should the victim offer resistance.' " Smith, 191 Ill. 2d at 418 (Miller, J., concurring in part and dissenting in part, joined by Freeman and McMorrow, JJ.), quoting People v. Alejos, 97 Ill. 2d 502, 508 (1983). Justice Miller asserted that "[t]he same potential danger existed *** at least until the defendant decided to abandon his weapon." Smith, 191 Ill. 2d at 418 (Miller, J., concurring in part and dissenting in part, joined by Freeman and McMorrow, JJ.). Justice Miller's point, expressed in the language of Condon, was that when the defendant first spotted the police approaching his apartment building, he had to make a "spontaneous and *** instantaneous decision" (Condon, 148 Ill. 2d at 109) whether to take deadly action or to disarm, and though he choose the latter, he could easily have chosen the former--at the very probable cost of life and limb.

The final authority we discuss is Neylon. In Neylon, the police were called to the defendant's residence to investigate a report of shots fired. The defendant was found standing outside his residence. An unloaded handgun was found inside a bedroom closet. Ammunition for the gun, as well as narcotics, was found inside a bedroom dresser. The defendant himself was unarmed when the police found him. He was convicted of armed violence. Relying on Smith, the appellate court reversed the defendant's conviction. The

State argued that, even though the defendant was not armed when he was arrested, it was possible that he had the gun in his possession before the police arrived. The court rejected this supposition, noting that "[e]ven if there were evidence defendant had been in the house minutes before his arrest, the gun was still not immediately accessible to him unless he were standing next to the open closet door and the gun were loaded." Neylon, 327 Ill. App. 3d at 309. The court went on to acknowledge and agree with Justice McMorrow's claim in her dissent in Smith that the majority in that case had sub silentio overruled Harre. Neylon, 327 Ill. App. 3d at 309-10, citing Smith, 191 Ill. 2d at 419 (McMorrow, J., concurring in part and dissenting in part, joined by Miller and Freeman, JJ.). The court proposed that Smith rejected Harre's "core principle" that the determination of whether a defendant is armed is not made at the moment of arrest. Neylon, 327 Ill App. 3d at 309-10. The court considered itself bound by Smith, the later case:

> "Defendant Neylon was not armed when he was arrested outside the house, but at some earlier time he was in the house with the drugs and had some degree of access to the weapon. Whether that evidence would have been sufficient for a conviction under Harre is a question we need not answer. Instead, we are constrained to hold that if Smith, who the police saw drop his weapon out a window as they approached, is not guilty of armed violence, then a conviction of defendant in this case cannot stand. We believe the dissents in Smith are consistent with precedent and public policy, but we must adhere to the majority decision." Neylon, 327 Ill. App. 3d at 310.

Defendant suggests that the reversals of the armed violence convictions in Condon, Smith, and Neylon were all based on the "physical separation of the defendant from the

gun at the time of the arrest."  Hence, defendant argues, his conviction must be reversed because he "divested himself of the weapon before he was taken into custody."  Enlisting with the majority in <u>Neylon</u> and the dissent in <u>Smith</u>, defendant contends that <u>Smith</u> is irreconcilable with <u>Harre</u>'s statement that "the determination of whether a defendant is armed is not made at the moment of arrest" (<u>Harre</u>, 155 Ill. 2d at 401).  We disagree.  The determinative point for <u>Smith</u> is not the moment of arrest <u>per se</u>, but the moment when the defendant no longer poses the kind of threat that the armed violence law was designed to prevent.  What <u>Smith</u> did was narrow the set of circumstances that may be considered as raising that kind of threat.  Unlike the defendants in <u>Neylon</u> and <u>Condon</u>, the defendant in <u>Smith</u> had possession of a firearm when the police first saw him.  For the <u>Smith</u> majority, the critical fact was that the defendant did not have possession of or immediate access to a weapon " 'when the police entered' " the defendant's dwelling.  <u>Smith</u>, 191 Ill. 2d at 412, quoting <u>Condon</u>, 148 Ill. 2d at 110.[1]

---

[1]Of course, as Justice Miller persuasively demonstrated in his dissent in <u>Smith</u>, one may

reasonably argue that the defendant's possession of a gun as he stood at the window watching the police approach carried the immediate potential for violence and that a conviction of armed violence based on that possession would further the aims of the statute.

No. 2--04--0905

Of course, in <u>Harre</u>, which upheld a conviction of armed violence, the defendant was encountered and arrested entirely outdoors. Nonetheless, <u>Harre</u> is consistent with <u>Smith</u>. Whereas the defendant in <u>Smith</u> surrendered his gun voluntarily, before the police gave any commands, the defendant in <u>Harre</u> did not relinquish his access to a weapon until the police ordered him away from the car with guns drawn. In our supreme court's judgment, the scenario in <u>Harre</u> was more ripe with the potential for violence than <u>Smith</u>. The principle that may be culled from <u>Condon</u>, <u>Harre</u>, <u>Smith</u>, and <u>Neylon</u> is that a defendant is not guilty of armed violence unless he possesses a weapon at a time when there is the immediate potential for violence, such as during a drug transaction or an escalating encounter with the police (as evidenced in <u>Harre</u> by guns drawn and commands issued by police). As comparison of <u>Smith</u> and <u>Harre</u> indicates, whether or not the immediate potential for violence exists will depend on the unique facts of each case.

Viewing the evidence in light of these principles, we conclude that defendant is guilty of armed violence. Defendant was armed with a gun when the police confronted him. Unlike the defendant in <u>Smith</u>, he did not abandon the gun on seeing the police but retained it during part of his flight. Defendant's desperation could easily have sparked gun violence. The encounter carried potential for the very carnage that the armed violence law was meant to prevent. This is so despite that fact that no ammunition was found in the gun or on defendant's person. As we observed in a prior decision, the armed violence statute contains no requirement that a handgun must be loaded in order to qualify as a dangerous weapon. See 720 ILCS 5/33A--1(c)(1), (c)(2) (West 2002); <u>People v. Orsby</u>, 286 Ill. App. 3d 142, 149-50 (1996). By not discriminating between loaded and unloaded firearms, the

legislature advances the aim of the statute, as an unloaded firearm can provoke violent reaction from one who is not certain it is unloaded.

Having found a basis for defendant's conviction in the fact that he possessed a gun when the police confronted him, we need not determine whether defendant possessed the gun earlier during his attempts to sell the look-alike substance, which, under the Condon line of cases, would also have constituted armed violence.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

CALLUM and GILLERAN JOHNSON, JJ., concur.