# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Scott*, 2011 IL App (2d) 100990

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TORICO M. SCOTT, Defendant-Appellant. |
| District & No. | Second District <br> Docket No. 2-10-0990 |
| Filed | August 9, 2011 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for armed violence predicated on the possession of cannabis with intent to deliver was upheld where the evidence showed that at the time the police arrived to execute a search warrant for defendant's apartment, he was lying on a couch a short distance from a love seat under which he had placed a shotgun, he would have had little difficulty in reaching for the weapon and picking it up as the police entered, and the fact that he did not do so did not excuse him from guilt of armed violence, especially in view of the legislature's intention to deter the use of firearms in the commission of felonies by enacting the armed violence statute. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 09-CF-1799; the Hon. Thomas E. Mueller, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Scott A. Kent, of Martin, Kent & Reidy, LLC, of Wheaton, for appellant.

Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Diane L. Campbell, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE BIRKETT delivered the judgment of the court, with opinion.

Justices Hutchinson and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    After a bench trial, defendant, Torico M. Scott, was convicted of armed violence (720 ILCS 5/33A-2(a) (West 2008)) and sentenced to 12 years in prison. Defendant appeals, contending that he was not proved guilty beyond a reasonable doubt. We affirm.

¶ 2    Defendant was charged with two counts of armed violence, alleging that (1) while armed with a dangerous weapon, he committed a felony, possession of cannabis (720 ILCS 550/4(d) (West 2008)) and (2) while armed with a dangerous weapon, he committed a felony, possession of cannabis with the intent to deliver (720 ILCS 550/5(d) (West 2008)). Defendant was also charged with the two cannabis offenses; he pleaded guilty to possession with the intent to deliver, and the State dismissed the other charge. The case proceeded to a bench trial. We summarize the evidence.

¶ 3    Illinois state police officer Keith Chesnut testified as follows. On June 19, 2009, at about 5:35 a.m., he was part of a narcotics task force tactical unit that executed a search warrant at 217 Laurel, Unit A, in North Aurora. There were two entry teams, one at the front door and one at the back door. After knocking and opening the front door, Chesnut saw a stairway directly in front; to the left was a door that opened into a small living room. Chesnut opened the living room door and looked in. To his immediate left was a couch along the wall, in front of the windows. To his right was another couch, running along the wall adjacent to the stairway. As Chesnut stood in the doorway, the far end of either couch was no more than 10 feet from him.

¶ 4    Entering the living room, Chesnut saw defendant, who was standing five to seven feet from the door. Defendant was within a foot of either couch. Nobody else was in the living room. Chesnut saw nothing in defendant's hands. Chesnut approached defendant, pointed his M-4 semiautomatic carbine at him, and ordered him to lie on the ground. Defendant complied. Soon, another officer "flex-cuffed" defendant.

¶ 5    Charles Pierce, a St. Charles police officer who participated in executing the search warrant and collecting evidence, testified as follows. As he entered the living room, he saw a couch immediately to his left. The far end of the couch was no more than 10 feet from the

door. Immediately to his right was a shorter couch or love seat, the far end of which was seven or eight feet from the door. Pierce identified People's exhibit No. 1 as a shotgun that the officers found underneath the love seat. He also identified People's exhibit No. 11 as a photograph of the shotgun in the position that the officers found it. The shotgun had been "free and open on the carpet on the floor" under the love seat. The love seat's legs were about four inches tall.

¶ 6 The parties stipulated that defendant's guilty plea to possession of cannabis with the intent to deliver satisfied the State's burden to prove that, at the time of the alleged armed violence, he had been committing a felony (see 720 ILCS 5/33A-2(a) (West 2008)).

¶ 7 Aurora police inspector Paul Lindley testified as follows. He helped to execute the search warrant but stayed outside until the tactical unit had "cleared the location." Entering the apartment, Lindley learned that defendant had been secured on the couch in the living room. The couch and the love seat were about two feet apart. Lindley showed defendant a copy of the search warrant and gave him *Miranda* warnings. Lindley looked down and saw a scale and what looked like a bag of cannabis on the floor near defendant. He pointed to these objects and asked defendant what he had been doing. Defendant admitted that he had been up all night "weighing bags out and smoking cannabis." Defendant was then taken to the police station, where he signed a *Miranda* waiver and again spoke to Lindley. He told Lindley that he had the shotgun to protect himself from gang members who might break into his home.

¶ 8 The parties stipulated to the admission of the transcript of a hearing held July 1, 2009, on defendant's motion to reduce bond. At the hearing, defendant testified that, on June 19, 2009, he lived at 217 Laurel, Unit A, with his girlfriend and their two children. At about 5:30 a.m., he was at home when the police entered. At the time, defendant was 10 feet away, sleeping on the couch with his daughter. When he heard the police, he got up and walked toward the front door of the apartment. He had no weapons on his person.

¶ 9 Defendant moved for a directed finding, arguing that the State had failed to prove that, at the time of the alleged offense, he had been armed with a dangerous weapon (see 720 ILCS 5/33A-2(a) (West 2008)). Defendant contended that, even viewed in the light most favorable to the State, the evidence failed to show that, when the police entered the apartment, defendant was armed; he had been standing some distance from the love seat under which the shotgun lay and had had neither the opportunity nor the intent to reach for the weapon. The judge denied defendant's motion, explaining that People's exhibit No. 11 showed that the handle end of the shotgun had been "inches from the leg of the couch," thus placing the shotgun "within arm's reach" of defendant, who had testified that, just before the police knocked and entered, he had been sleeping on the couch.

¶ 10 Defendant then testified as follows. On the morning of June 19, 2009, he was home with his son and daughter. Defendant was in the living room, sleeping on the couch with his daughter. At about 5:30 a.m., he heard the police knock. Defendant rose and walked toward the door. He had put the shotgun under the love seat and had "kind of forgot[ten]" that it was there. When he rose, he was within four feet of the shotgun. He did not try to grab it or move toward the love seat. The police entered and pointed their guns at him. He put his hands up and was soon handcuffed.

¶ 11    The trial judge found defendant guilty, explaining his decision as follows. As defendant had pleaded guilty to possessing cannabis with the intent to deliver, the State had proved the predicate felony for armed violence. The only issue was whether the State had proved that defendant had been armed with a dangerous weapon–the shotgun. Whether defendant actually reached for the shotgun when the police entered was irrelevant. The intent of the armed violence statute is to deter those who commit crimes–including drug dealers such as defendant–from attempting to protect their enterprises or themselves by having access to dangerous weapons. Here, the evidence showed that defendant had placed the shotgun under the love seat, so as to protect himself. Given the dimensions of the living room, the shotgun had been "in close proximity to [defendant] when he [was] in that room." Therefore, the State had proved defendant guilty beyond a reasonable doubt. The court later sentenced defendant to 12 years' imprisonment and denied his motion to reconsider the sentence. Defendant timely appealed.

¶ 12    On appeal, defendant argues that he was not proved guilty of armed violence, which a person commits when, "while armed with a dangerous weapon, he commits any felony defined by Illinois Law [with exceptions not pertinent here]." 720 ILCS 5/33A-2(a) (West 2008). Defendant concedes that he committed a felony–possession of cannabis with the intent to deliver–and that the shotgun found under the love seat was a dangerous weapon. He maintains, however, that the evidence was insufficient to prove that, at any pertinent time, he was *armed* with the shotgun.

¶ 13    Defendant notes that being armed with a dangerous weapon means either having it on one's person, which the State did not contend and the evidence did not support, or having "immediate access to or timely control over" the weapon (*People v. Harre*, 155 Ill. 2d 392, 396 (1993); see *People v. Condon*, 148 Ill. 2d 96, 110 (1992)). Defendant argues that, under *Condon*, *People v. Smith*, 191 Ill. 2d 408 (2000), and *People v. Shelato*, 228 Ill. App. 3d 622 (1992), the State could not obtain a conviction merely by proving that defendant committed the cannabis offense while being armed with the shotgun; rather, the State had to prove that defendant was "armed" at a time when there was the potential for the danger that the armed violence statute was intended to prevent. According to defendant, the only such times were immediately before the police entered and immediately after the police entered. Defendant contends that neither period satisfies the test established by the case law. For the reasons that follow, we disagree.

¶ 14    In considering a challenge to the sufficiency of the evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the State, any rational fact finder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992); *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). The trier of fact is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004). Of course, while finding the facts is not our prerogative, the legal import of a given set of facts is a question of law that we review *de novo*. *People v. Anderson*, 364 Ill. App. 3d 528, 532 (2006).

¶ 15    To explain our decision, we must recapitulate the case law. In *Condon*, the supreme court held that merely possessing a dangerous weapon is not being "armed" with it. The court also

suggested that even committing the predicate felony while being "armed" with the dangerous weapon is not necessarily armed violence. In *Condon*, police officers entered and searched the home where the defendant lived and sold cocaine. They found him in the kitchen, where there were no weapons. There were guns elsewhere in the house, far out of the defendant's reach. There was no evidence of when, if ever, he had had immediate access to the guns. Rejecting the State's argument that the defendant was guilty of armed violence merely because he had engaged in the ongoing drug felony while constructively possessing the guns, the court first noted that the purpose of the statute is "to deter felons from using dangerous weapons so as to avoid the deadly consequences which might result if the felony victim resists." *Condon*, 148 Ill. 2d at 109. The court continued:

> "Were we to find the presence of guns in the house with the cocaine enough to violate the armed violence statute, [that] would be contrary to the purpose for which the statute was enacted. Rather, we find that defendant would have had to carry a weapon on his person or *** to have had 'immediate access to' or 'timely control over' a weapon *when the police entered* to have been 'otherwise armed.' " (Emphasis added.) *Id*. at 110.

¶ 16 Although the court was concerned primarily with the meaning of "armed," the use of the language that we have emphasized suggests that merely committing the predicate felony while being "armed" is not armed violence, at least if there is not an imminent threat of violence.

¶ 17 In *Harre*, the defendant rode on the passenger's side of the hood of a car, then jumped down and took two steps toward the rear of the car until he was next to the partly open window of the passenger's door. A police officer, with his gun drawn, identified himself and ordered the defendant to stand with his hands against the hood. The defendant had the keys to the car; illegal drugs were inside the car; and two guns were in the middle of the car's front seat. *Harre*, 155 Ill. 2d at 394-95.

¶ 18 Affirming the defendant's conviction of armed violence, the supreme court concluded that the defendant had been "armed" with the guns, as they had been within his immediate reach as he had stood next to the car door and the partially open window. *Id*. at 396. The defendant easily could have reached for the guns. In language suggesting that the defendant's guilt did not depend on the circumstances of his encounter with the police, the court noted that the evidence allowed the inference that the defendant "had moments before his apprehension been riding in the car on his way to a drug delivery with a weapon inches from his grasp." *Id*. at 400.

¶ 19 The court noted further that, just before the police stopped him, the defendant had moved closer to the car door and had almost opened it, which would have given him complete access to and control over the guns. When the officer ordered him back, the defendant did not actually try to get one of the guns. However, his submission to the officer's show of force did not negate his guilt of armed violence. The court explained:

> "[T]he determination of whether a defendant is armed is not made at the moment of arrest. Rather, armed violence occurs if a defendant commits a felony [while he is] armed. We would completely eviscerate the deterrent purpose of the armed violence statute if we were to require police officers to wait to announce their presence and effect an arrest until a defendant's access and control over a readily available weapon had

ripened into the temptation to take actual physical possession ***." *Id*. at 401.

¶ 20　　　*Harre* clarified that it is the possibility of violence, and not the defendant's actual intent to commit or threaten violence, that is crucial. Moreover, whatever the import of *Condon*'s emphasis on "when the police entered" (*Condon*, 148 Ill. 2d at 110), the defendant's guilt need not depend on what happens after he has been apprehended or arrested–and may even be proved by what happened before the police arrived at all.

¶ 21　　　The supreme court next addressed a police-encounter situation in *Smith*. There, the defendant had an unloaded gun, which he threw out a bedroom window as the police approached his apartment and its drug-laden living room. The supreme court majority held that the defendant was not guilty of armed violence. The majority focused on *Condon*'s statement that there (as in *Smith*) the defendant did not have immediate access to or timely control over the weapon when the police entered. *Smith*, 191 Ill. 2d at 412. The court also explained that the policy behind the armed violence statute would not be served–and could be frustrated–by applying it to someone who dropped an unloaded gun out the window before the police arrived. *Id*. at 412-13.

¶ 22　　　A concurrence noted that the defendant deliberately chose to avoid the danger that the armed violence statute sought to address, so that the statute served its deterrent purpose. However, the concurrence also noted that the defendant did not possess or have immediate access to a weapon "when the police arrived." *Id*. at 415 (Rathje, J., specially concurring).

¶ 23　　　The three dissenters noted that the majority opinion ignored *Harre*, and they asserted that it had implicitly overruled *Harre*. They also noted that the defendant, unlike the defendant in *Condon*, had had immediate access to a weapon immediately before he was arrested. The danger that the armed violence statute addressed was present until he tossed out the gun. Also, the dissenters urged, perhaps inconsistently with *Condon*, that all the State needed to show was that the defendant was armed when he committed the predicate offense *Id*. at 417-18 (Miller, J., concurring in part and dissenting in part, joined by Freeman and McMorrow, JJ.), 419, 420 (McMorrow, J., concurring in part and dissenting in part, joined by Miller and Freeman, JJ.).

¶ 24　　　In *Anderson*, police officers heard a report of a man discharging a gun; when they arrived at the scene, they saw the defendant ducking down behind a fence. The officers stopped, exited, and identified themselves. The defendant ran; the police pursued him; and the defendant threw down a gun, ran some more, and was arrested. He was carrying illegal drugs. *Anderson*, 364 Ill. App. 3d at 529-30.

¶ 25　　　The defendant had had the gun when the officers first encountered him; he argued that that was not sufficient to make him guilty of armed violence, because he no longer had the gun when the police arrested him. *Id*. at 537. We discussed the supreme court's opinions and concluded that *Smith* does not make the moment of arrest the "determinative point"; instead, the determinative point is "the moment when the defendant no longer poses the kind of threat that the armed violence law was designed to prevent." *Id*. at 541. What was crucial in *Smith* was not the "moment of arrest" but that the defendant no longer was "armed" when the police entered. *Id*. at 541-42. Also, *Harre* was consistent with *Smith*, because there (unlike in *Smith*), the defendant possessed the gun when there was an immediate potential for violence. *Id*. at 542. Thus, the defendant in *Anderson* was guilty of armed violence, because

the potential for violence was present between when he first encountered the police and when he abandoned the gun. That the defendant did not try to use the gun against the officers was legally irrelevant–just as it had been in *Harre*.

¶ 26     We also note two opinions that predate *Condon* but are consistent with that opinion and the others that we have noted. In *People v. Bond*, 178 Ill. App. 3d 1020 (1989), police officers knocked on the defendant's door; they heard noises from inside; and they broke down the door, finding a sofa blocking their way. Later, they found drugs. There was a loaded handgun under the sofa where the defendant had been sitting. *Id*. at 1021. Affirming the defendant's conviction of armed violence, the appellate court explained that the defendant had been armed, as the gun had been well within his reach as he sat on the sofa. Thus, the situation presented the special risk of violence that the statute had been intended to address. *Id*. at 1023.

¶ 27     In *Shelato*, the police had a warrant to search the defendant's mobile home. Two officers knocked; the defendant told them to come in. The officers entered the living room and saw that the defendant was talking on the phone. They told him that they wanted to buy a car outside; the defendant hung up the phone, and the officers disclosed their real purpose. The defendant stayed seated on his couch. He did not resist as several officers searched the home. On the floor was a duffel bag, inside of which were numerous bags of marijuana, a loaded gun, and a box of shells. The gun was not visible when the bag was first opened, and it was wrapped in a rag and located toward the bottom of the duffel bag, underneath the marijuana. *Shelato*, 228 Ill. App. 3d at 623-24.

¶ 28     The appellate court vacated the defendant's conviction of armed violence, holding that the gun had not been immediately accessible to him. The court explained that, when the officers entered, the gun was "some distance" from the defendant, on the other side of a room that was at least 15 feet wide. *Id*. at 627. Moreover, even had the defendant been nearer the duffel bag, he could not have reached the gun without unzipping the bag, digging beneath the bags of marijuana, and removing the gun from the rag. The court thus distinguished the case from *Bond*. *Id*.

¶ 29     Applying the statute, as judicially construed, to this case, we hold that defendant was proved guilty of armed violence. Specifically, we note the following. First, defendant's reliance on *Smith* is misplaced. Here, defendant never abandoned the dangerous weapon at all. *A fortiori*, he did not abandon the weapon before its presence created the type of danger that the armed violence statute was intended to prevent. Second, the lack of actual violence in this case is a red herring. The defendants in *Harre* and *Anderson* did not actually try to use their weapons against the police (or anyone else); their convictions were affirmed anyway. The potential for violent encounters, not whether–in hindsight–any such encounters took place, is the concern of the armed violence statute.

¶ 30     In this case, defendant was "armed with a dangerous weapon" (720 ILCS 5/33A-2(a) (West 2008)) under the type of circumstances that the armed violence statute was designed to address. When the police arrived outside his apartment, defendant was lying on the couch, perhaps a foot or two away from the love seat under which he had placed the shotgun. The photograph of the love seat and the shotgun show that, although the coffee table might have been a slight inconvenience, defendant would have had little difficulty getting up, reaching

for the gun, and taking control of it as the doors of the apartment opened. That he did not do so, and that he did not attempt resistance after the police entered the apartment, does not rescue him from guilt of armed violence. Defendant's situation is less similar to those of the defendants in *Condon, Smith*, and *Shelato*, all of whom were separated from their weapons by the time that they encountered the police, than it is to those of the defendants in *Anderson* and, especially, *Bond*.

¶ 31 More generally, defendant's conviction is consistent with the intent of the armed violence statute, which was enacted in response to the legislature's conclusions that (1) "[t]he use of a dangerous weapon in the commission of a felony offense poses a much greater threat to the public health, safety, and general welfare, than when a weapon is not used in the commission of the offense" (720 ILCS 5/33A-1(a)(1) (West 2008)); and (2) "the use of a firearm greatly facilitates the commission of a criminal offense" (720 ILCS 5/33A-1(a)(2) (West 2008)). Defendant's conviction is, therefore, consistent with the legislature's intent to deter the use of firearms in the commission of felony offenses. See 720 ILCS 5/33A-1(b)(1) (West 2008). The evidence showed that defendant was in the business of selling cannabis, an enterprise that he knew was dangerous, and that he protected his business with his shotgun, kept close to his merchandise. He was no less armed than a liquor store owner who keeps a weapon under the counter to protect himself and his money from potential robbers.

¶ 32 The judgment of the circuit court of Kane County is affirmed.

¶ 33 Affirmed.