# Illinois Official Reports

## Appellate Court

---

**_People v. Loggins_, 2019 IL App (1st) 160482**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANNY LOGGINS, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-16-0482 |
| Filed | May 29, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-1864(01); the Hon. Luciano Panici, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, mittimus corrected, and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Eric E. Castaneda, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion. |

## OPINION

¶ 1    The police entered a house in Harvey to execute a search warrant and found defendant Danny Loggins, along with three other people, sitting around the table in the dining room. Defendant sprang up and ran out the back door, leaving behind a handgun that had been within arm's reach on a nearby chair. He was arrested, unarmed, in the yard. The police found cocaine in a drawer in the dining room and assorted paraphernalia nearby. A jury convicted defendant of armed violence and the predicate offense of possession of a controlled substance with intent to deliver. (At a simultaneous bench trial, the judge found him guilty of unlawful possession of a weapon by a felon, but neither that conviction nor the bench trial is at issue in this appeal.)

¶ 2    Defendant raises several issues on appeal. He challenges the sufficiency of the evidence to sustain either of the jury's verdicts. He says he was prejudiced when an officer was allowed to testify about the uses of the paraphernalia found in the house without being accepted as an expert on drug distribution. He argues that the trial court erred in requiring him to serve (at least) 85%, rather than 50%, of his sentence, pursuant to the truth-in-sentencing law. And he challenges various aspects of the fines-and-fees order.

¶ 3    Because there was no finding, and indeed no evidence, that defendant caused anyone great bodily harm, we agree that he is eligible to receive day-for-day credit on his sentence for armed violence. We otherwise affirm his convictions and sentence. We also remand to the circuit court, pursuant to Illinois Supreme Court Rule 472, for defendant to file a motion challenging certain monetary assessments and *per diem* credits.

¶ 4                                   BACKGROUND

¶ 5    On the evening of December 21, 2012, the police arrested defendant while executing a search warrant at 15307 Turlington Avenue in Harvey. Detectives Ostrowski and McCalpine of the Harvey Police Department, both of whom testified for the State, were among the half-dozen or so officers who entered the three-bedroom house at that address.

¶ 6    The officers knocked and announced their presence. There was no response, and they did not hear any voices or other noises inside. After waiting somewhere between 30 and 60 seconds, the officers shattered the glass on the screen door and broke down the front door of the house with a battering ram. They continued to announce their presence as they entered the house and walked through the living room, into the adjoining dining room. There, they found four people, including defendant, sitting around the table. Defendant immediately got up, ran into the kitchen, and fled out the back door.

¶ 7    Ostrowski followed defendant outside. Defendant initially hopped a fence but then came back, walked toward Ostrowski, and was arrested, unarmed, in the yard. Ostrowski never saw defendant with a gun.

¶ 8    Meanwhile, McCalpine found a handgun on the seat of a chair in the dining room. On direct examination, he testified that it was the chair next to defendant, about one foot away from where defendant had been sitting. On cross-examination, McCalpine acknowledged that, in his police report, and again in his grand-jury testimony, he had said that the gun was on defendant's chair, not the chair next to him. In any event, a photo, taken by McCalpine and published to the jury, depicts a chair in the dining room with a White Sox cap, a coat underneath the cap, and a handgun underneath the coat. The handle of the gun is sticking out from underneath the

coat. McCalpine never saw defendant with that (or any other) gun, and he did not know who put the handgun on the chair. A fingerprint expert from the Illinois State Police testified that no latent prints suitable for comparison were found on the handgun or the magazine. The handgun was loaded with 15 live rounds.

¶ 9    After the occupants were secured, the police searched the entire house. In a drawer in the dining room, about three feet away from where defendant was sitting, they found a plastic bag containing a white, rock-like substance. Testing later confirmed that it was 8.2 grams of cocaine.

¶ 10    On the floor in the dining room, also about three feet away from defendant, the police found a box full of paraphernalia, including measuring spoons, a measuring cup, two strainers, two digital scales, a box with a large quantity of small plastic bags (upwards of a thousand, McCalpine estimated), a bottle of "instatal," and another bottle of an unspecified dietary supplement. They also found more plastic bags and two blenders elsewhere in the dining room and a 12-gauge shotgun in the corner of the living room.

¶ 11    Without objection, McCalpine testified that small plastic bags are commonly used to package narcotics; that blenders are commonly used to blend and cut heroin; and that "instatal" is a dietary supplement commonly used to "multiply," or cut, cocaine. (Based on this testimony, we surmise that the term "instatal," as it occurs in the report of proceedings and the parties' briefs, is a misspelling of "inositol," a common cutting agent for cocaine. See, *e.g.*, *People v. Adams*, 388 Ill. App. 3d 762, 765 (2009); *People v. Caro*, 381 Ill. App. 3d 1056, 1064 (2008).)

¶ 12    McCalpine based his testimony about the plastic bags, blenders, and inositol on his "training and experience" as a narcotics officer. At the time of the search, he had served on the narcotics-investigation unit of the Harvey Police Department for 5 years, and he had been an officer for a total of 12 years. He had completed 40 hours of narcotics training at the Chicago Police Academy, and he completed ongoing, annual narcotics training from an organization referred to in the transcript as the "Illinois Department of Drug Enforcement Association." The State did not tender McCalpine as an expert, and the trial court did not qualify him as one.

¶ 13    During the search, the officers found defendant's state identification card, which listed 15307 Turlington Avenue as his residence. Defendant's identification was issued on August 24, 2011, and was valid until December 7, 2016. The officers also found two photos of defendant on the mantle in the living room. McCalpine testified that he found clothes in a bedroom closet that appeared to fit defendant—who is 6 feet 7 inches and weighs around 240 pounds—but he did not inventory or photograph them. The officers did not find any utility bills or other mail addressed to defendant, any keys to the house belonging to defendant, or any lease agreement or mortgage documents in defendant's name.

¶ 14    Ostrowski and McCalpine interviewed defendant at the station after his arrest. They did not record the interview, although audio and video equipment was available. McCalpine testified that defendant was read his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), signed a waiver, and made a statement.

¶ 15    Defendant told the officers that he started selling drugs "to feed his family" after his trucker's license was suspended, due to his failure to pay child support. He admitted that the handgun in the dining room and the shotgun in the living room were his, and he said that he "had them there for New Year's Eve to shoot them off." Defendant also confirmed that he lived at 15307 Turlington Avenue. McCalpine memorialized defendant's oral statement in

writing, based on his interview notes, but defendant refused to sign it. Among other (unspecified) reasons, McCalpine testified, defendant refused because "the state's attorney could use [the written statement] against him at a trial."

¶ 16      After defendant was convicted, the trial court merged his convictions, sentenced him to 15 years in prison for armed violence, and ordered him to serve that sentence at 85% time. The trial court also imposed $4394 in monetary assessments and awarded defendant 476 days of credit for presentence incarceration. This appeal followed.

¶ 17                                   ANALYSIS

¶ 18                                        I

¶ 19      Defendant first argues for a reversal of his conviction for armed violence. To prove that he committed this offense, the State had to prove that he committed a predicate felony (namely, possession of cocaine with intent to deliver) "while armed with a dangerous weapon." 720 ILCS 5/33A-2(a) (West 2016). Defendant argues that the State failed to prove that he was armed within the meaning of the statute, for two independent reasons. We take each in turn.

¶ 20                                        A

¶ 21      There is no dispute that defendant was unarmed when Ostrowski arrested him outside the house. For this reason, he says, he did not commit armed violence. Defendant thus appears to argue, at least implicitly, that the statute requires proof that he was armed at the moment of his arrest. This contention presents an issue of statutory interpretation, which we review *de novo*. *People v. Anderson*, 364 Ill. App. 3d 528, 537 (2006).

¶ 22      Defendant's interpretation of the armed-violence statute is wrong: "[T]he determination of whether a defendant is armed is not made at the moment of arrest." *People v. Harre*, 155 Ill. 2d 392, 401 (1993); see also *People v. Curry*, 2018 IL App (1st) 152616, ¶ 18.

¶ 23      As our supreme court has explained, a felon with immediate access to a weapon will have to make a "spontaneous" decision whether to use deadly force and thus will be more likely to spark a violent encounter, when faced with resistance from a police officer, victim, or another criminal. *Harre*, 155 Ill. 2d at 395; *People v. Condon*, 148 Ill. 2d 96, 109-10 (1992). The purpose of the armed-violence statute is to minimize the potential for such violence by disarming felons, thus eliminating the need for them to decide, in the heat of the moment, whether to resort to deadly force. *Harre*, 155 Ill. 2d at 395; *Condon*, 148 Ill. 2d at 109-10.

¶ 24      In many confrontations with the police, the felon is not arrested until after, perhaps even long after, that heat-of-the-moment decision first had to be made. Thus, a requirement that the felon must be armed—or more precisely, still armed—at the moment of arrest is too narrow and restrictive to serve the statute's deterrent purpose. *Harre*, 155 Ill. 2d at 401.

¶ 25      Far from being narrowly limited to the moment of arrest, the statute broadly requires the felon to be armed at any point that creates an "immediate potential for violence." *Anderson*, 364 Ill. App. 3d at 538-39. In some cases, that potential is present because the felon is armed during, or en route to, the underlying felony—for example, when a drug dealer brings a gun to a transaction. See, *e.g.*, *Harre*, 155 Ill. 2d at 400-01 (defendant had access to gun while en route to drug sale); *Curry*, 2018 IL App (1st) 152616, ¶¶ 18, 22 (defendant had gun during drug sale). But that was not the case here.

¶ 26    In other cases, the potential for violence arises because the felon is armed when confronted by the police during the course of, or while fleeing from, the underlying felony. See, *e.g.*, *Anderson*, 364 Ill. App. 3d at 529-30, 537 (defendant armed when police approached him). This is typically the case when the underlying felony is a possession offense.

¶ 27    And sometimes, the police confront the felon in a home while executing a search warrant, as they did here. In these circumstances, the felon commits armed violence if (among other things) he was armed "when the police entered" the premises to execute the warrant. *Condon*, 148 Ill. 2d at 110; see also *People v. Smith*, 191 Ill. 2d 408, 412 (2000). That is our inquiry.

¶ 28                                                      B

¶ 29    The question presented—whether the State proved that defendant was armed when the police entered the house—is a factual, rather than a legal, question. So we must ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found this element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 30    Defendant claims that his guilt is purely a question of law and thus we should review his conviction *de novo*, instead of applying the deferential *Jackson* standard to the jury's verdict. He notes that in *Smith*, 191 Ill. 2d at 411, the supreme court reviewed a conviction for armed violence *de novo* because, as the court found in that case, "the facts [were] not in dispute" and Smith's guilt was therefore "a question of law."

¶ 31    Defendant misreads *Smith*. In that case, the police went to Smith's apartment to execute a search warrant. *Id.* at 410. As the police approached the building, Smith dropped a gun out a window. *Id.* Inside Smith's apartment, the police found cocaine but no weapons. *Id.* Based on this evidence, the following factual inferences were undisputed on appeal: (1) Smith was armed at a time when he (constructively) possessed cocaine in his apartment, but (2) Smith was no longer armed when the police "arrived" and "entered" the apartment to search it. See *id.* at 411-13. The critical point is that there was no dispute about whether Smith was, or was not, armed at any particular time. The only question was whether the statute applied to a defendant who was armed *at the time* that Smith was armed. That was a question of statutory interpretation—a variant, in fact, of the question we answered above—which is why the supreme court said that Smith's guilt was a question of law. *Id.* at 411.

¶ 32    Here, the facts are not undisputed, in the sense intended in *Smith*, because the parties disagree about the inferences that can be drawn from the trial evidence. Defendant claims that he was *never* armed—not when he was arrested outside, and not when he was inside, either. The State counters that defendant *was* armed when the police entered the house (albeit no longer armed when he was arrested). That is a factual dispute. Defendant's guilt is not a question of law. We review his conviction under the *Jackson* standard.

¶ 33    For purposes of the armed-violence statute, a person is "armed with a dangerous weapon" when he "carries on or about his or her person or is otherwise armed with" a firearm or other qualifying weapon. 720 ILCS 5/33A-1(c)(1)-(2) (West 2016). Because the statute applies to a person who is "*otherwise* armed"—that is, someone who is not carrying a weapon—it does not require actual or physical possession of a weapon. *Harre*, 155 Ill. 2d at 401. But it requires more than mere constructive possession. *Condon*, 148 Ill. 2d at 110-12 (defendant had constructive possession of, but was not armed with, guns found in other rooms of house when police confronted him in his kitchen). A person is "otherwise armed" if he has "immediate

access to or timely control over" a weapon. *Harre*, 155 Ill. 2d at 396; *Condon*, 148 Ill. 2d at 110.

¶ 34    The State's theory was that defendant was "otherwise armed" with the handgun in the dining room. Defendant and three other people were sitting around the table. When the police entered the dining room, defendant immediately got up and ran out of the house. On direct examination, McCalpine testified that there was a handgun on the chair next to defendant, about one foot away from where he was sitting. A photo taken by McCalpine shows a handgun underneath a coat and White Sox cap on the seat of a dining room chair; the handle of the gun is sticking out from underneath those items. McCalpine acknowledged that, in his police report and his grand-jury testimony, he had previously said that the handgun was on defendant's chair, not the chair next to him.

¶ 35    Taking the facts in the light most favorable to the State, a rational jury could find that defendant was "otherwise armed" with the handgun. Whether that gun was on defendant's chair or on another chair one foot away from him, it was well within his reach. And although the photo shows that it was partly covered by a hat and coat, the handle of the gun was sticking out and clearly accessible. On any view of this evidence, defendant easily could have grabbed the handgun, if he had chosen to. He had "immediate access" to that weapon when the police entered the house. See *Harre*, 155 Ill. 2d at 396; *Condon*, 148 Ill. 2d at 110.

¶ 36    Our cases bear out this conclusion. For example, the defendant in *People v. Scott*, 2011 IL App (2d) 100990, ¶ 30, had immediate access to a gun that was on the floor, under a loveseat, "perhaps a foot or two away" from the couch he was on when the police arrived with a search warrant. The defendant in *People v. Bond*, 178 Ill. App. 3d 1020, 1023 (1989), had immediate access to a gun that was underneath the sofa cushion he was sitting on while the police searched his house. And the defendant in *People v. Hernandez*, 229 Ill. App. 3d 546, 550 (1992), had immediate access to a gun that was under his mattress, near the edge of the bed and thus within his reach, when the police arrived. Here, the handgun on the dining room chair was at least as accessible to defendant—if not more so—than the weapons in these cases. Defendant was "otherwise armed" with the handgun.

¶ 37    Defendant's cited cases do not show otherwise. In *Condon*, 148 Ill. 2d at 110, the police encountered the defendant in his kitchen after entering on a warrant; during the search, they found guns in several rooms of the house, including various bedrooms and an office, but none in the kitchen. The guns in *Condon* were analogous to the shotgun in defendant's living room, but not the handgun within his immediate reach in the dining room. (The State has never argued, either at trial or on appeal, that a conviction for armed violence could be based on the shotgun.)

¶ 38    In *People v. Neylon*, 327 Ill. App. 3d 300, 303, 309 (2002), the police confronted and arrested the defendant outside of his house and later found a gun in his bedroom closet while searching the house. Unlike defendant here—who had a gun within his immediate reach when the police first confronted him—there was *no* time during Neylon's encounter with the police at which he could have accessed his weapon. See *id.* at 309.

¶ 39    In *People v. Shelato*, 228 Ill. App. 3d 622, 623-24, 627 (1992), the defendant and his gun were at least in the same room when the police entered his house on a warrant. But still, the gun was not at his disposal: It was on the other side of the room, some 15 feet away, and at the bottom of a closed duffle bag, wrapped in a rag and buried under 60 or so bags of cannabis. *Id.* at 627. There was no realistic chance that he could have accessed that gun.

¶ 40 Lastly, relying on *Smith*, 191 Ill. 2d 408, defendant argues that when he ran out of the house, he "abandoned any possession of the handgun" and thus eliminated any threat of violent confrontation with the police. In this respect, he says, he was like the defendant in *Smith*, who dropped his gun out of his apartment window while the police were approaching the building. See *id.* at 410.

¶ 41 But there is a crucial difference: Smith disposed of his gun *before* the police entered his apartment; defendant, in contrast, was armed when the police entered the house and confronted him. At that moment, there certainly *was* the potential for a violent encounter, since defendant *could* have grabbed the handgun. Granted, he did not, and that was a mitigating fact to be considered at sentencing, but "it is the possibility of violence, and not the defendant's actual intent to commit or threaten violence, that is crucial" to the question of his guilt. *Scott*, 2011 IL App (2d) 100990, ¶ 20.

¶ 42 So even if defendant "distanced himself" from the handgun, as he says, it was too late for him to escape liability for armed violence. As long as he was "otherwise armed" at *some* point during his confrontation with the police, which he was, he committed the offense—even if he abandoned the handgun soon after that. *Anderson*, 364 Ill. App. 3d at 529-30, 537 (conviction affirmed, as defendant was armed when police first approached him, though he disposed of gun while in flight).

¶ 43 In sum, because defendant was "otherwise armed" with the handgun, he committed the offense of armed violence.

¶ 44                                                    II

¶ 45 Defendant also argues for a reversal of his conviction for possession of a controlled substance with intent to deliver (and, by extension, his armed-violence conviction, which was predicated on this offense). To prove this charge, the State had to prove that "defendant had knowledge and possession of the drugs." *People v. Givens*, 237 Ill. 2d 311, 334-35 (2010); see 720 ILCS 570/402 (West 2016). These are both questions of fact for the jury to resolve. *People v. Schmalz*, 194 Ill. 2d 75, 81 (2000). The State's theory was that defendant had constructive possession and knowledge of the cocaine found in the house, because he lived there, admitted to the police that he sold drugs, and had a significant amount of paraphernalia in his dining room, where defendant and the cocaine were both found. Defendant counters that the State did not prove that he lived in the house and, even if it did prove that much, it failed to prove that he had knowledge of, or the intent to control, the specific bag of cocaine that the police found.

¶ 46                                                    A

¶ 47 Possession is constructive, as the State alleged here, when a defendant has the "intent and capability to maintain control and dominion" over an item of contraband, though he does not have immediate personal control of it. *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992). The intent (and capability) to control the *item* can be inferred when the defendant "exercised immediate and exclusive control" over the *area* where that item was found. *People v. Maldonado*, 2015 IL App (1st) 131874, ¶ 23. And control over the area generally can be inferred when the area is within the defendant's residence. *Id.* ¶ 29; *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17.

¶ 48        Defendant argues that the State failed to prove that he lived at 15307 Turlington Avenue. Despite searching the entire house, the police did not find any utility bills or other mail addressed to defendant, any keys to the house belonging to him, or any lease or mortgage documents in his name. These items are undoubtedly relevant to the question of residency, and the absence of any of them here is surely a point in defendant's favor. But while there is no shortage of cases in which these items, in some combination, added up to *sufficient* proof of residency, defendant does not cite, and we have not found, a case in which any one of these items—or any other item, for that matter—was held to be *necessary* for proof of residency. The State needed to offer the jury sufficient evidence from which it could infer that defendant lived at that address, but no particular form of proof was required.

¶ 49        In the first instance, the State points to defendant's state identification card, which listed 15307 Turlington Avenue as his address. Although his identification was valid, defendant argues that it was nonetheless "stale" by the time he was arrested, nearly 16 months after the identification was issued. In the meantime, he says, his "living circumstances could have changed." Yes, they *could* have. And they *could* have changed the week, or the day, after he got his identification. How long does it take for an identification to go "stale?" Defendant does not say. But the logic of his position, sparse at it is, seems to imply that an identification is virtually always "stale."

¶ 50        We reject that implication. A person's state-issued identification is, and always has been, evidence of his or her address, as long as the identification is still valid. That's not to say it is always sufficient, on its own, to prove residency; other facts may indeed suggest that the person has moved since the identification was issued. See *People v. Alicea*, 2013 IL App (1st) 112602, ¶¶ 12-14, 28-32 (witness testified that defendant had moved from address listed on driver's license abstract before search warrant executed at that address). The lack of mail, keys, or documents linking defendant to the house were such facts. But those facts only carry defendant so far, since there was other evidence that *did* link him to the house.

¶ 51        According to McCalpine, defendant confirmed that he lived at the address listed on his identification when he was interviewed at the police station. Defendant notes that the police could have, but did not, record the interview and that he refused to sign the written statement that McCalpine generated based on the interview. But as far as we know, he did not refuse because something McCalpine wrote down was false; he refused because he did not want to give the State a written statement that it could use against him at a trial. And in any event, McCalpine's testimony about defendant's oral statement was not inherently contradictory or patently unbelievable. A rational jury could have credited that testimony—with or without a signed, written statement in evidence and with or without a recording of the interview. We have no basis to discredit that determination.

¶ 52        That testimony scotches any potential doubts about the "freshness," so to speak, of defendant's then-valid identification. And it distinguishes this case from *People v. Ray*, 232 Ill. App. 3d 459 (1992), a case on which defendant relies. There, we found that a cable bill in the name of one of the codefendants was not sufficient proof that he (or any other codefendant) lived in the apartment where the codefendants, the cable bill, and the drugs were found. *Id.* at 462-63. That was in part because the cable bill was six months old—"stale," as defendant would say. But in so finding, we stressed that there was "no testimony *** which established that any of defendants admitted that the apartment was their residence" and, indeed, when they were asked to confirm their residences, they all gave *other* addresses. *Id.* at 462. Not so here.

¶ 53    The identification and McCalpine's testimony, taken together, provide more than sufficient proof of defendant's residency. And on top of that, the police found photos of defendant on the mantle in the living room. True, a photo alone "does not equate with" residency, as defendant says. It's not unusual for people to display pictures of their family and friends in their homes. But these photos of defendant were found in the house where his identification said that he lived—and where *he* said that he lived. When viewed alongside this other evidence, the photos of defendant on the mantle provide even more confirmation that he lived in the house. See *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003) (defendant constructively possessed contraband in dresser when police found photos of defendant and recent mail on top of dresser).

¶ 54    We will leave it at that. Defendant cites numerous other cases in support of his residency arguments, but none of them shed any meaningful light on the facts or issues in this case. And we need not decide whether the clothes purportedly found in a bedroom closet provide further evidence that defendant lived there. Based on defendant's state identification, his oral statement to the police confirming his address, and the photos of him over the fireplace, the jury could draw a reasonable inference that defendant lived in the house.

¶ 55                                    B

¶ 56    Even so, defendant says, the State failed to prove that he had any knowledge of, much less the intent to control, the particular bag of cocaine that the police found. Once possession has been proven, knowledge may be inferred from "the surrounding facts and circumstances" of the possession, including the defendant's declarations, acts, or conduct. *Schmalz*, 194 Ill. 2d at 82; *Spencer*, 2012 IL App (1st) 102094, ¶ 17. In addition to the proof of defendant's residency, the State presented evidence that he admitted to the police that he sold drugs. And throughout his dining room, along with the cocaine, the police found the tools of his admitted trade—measuring spoons and cups, strainers, digital scales, hundreds of small plastic bags, and more. From this evidence, the State argues, the jury could reasonably infer that defendant knew the cocaine was there, and that it was his. We agree.

¶ 57    Defendant's arguments to the contrary are not convincing. First, he argues that his oral statement to the police proves nothing. We have already explained why his refusal to sign the *written* statement does not mean that the jury had to discount McCalpine's testimony about defendant's *oral* statement. Apart from that argument, defendant also says that he merely admitted—as a general matter—that he sold drugs. He never admitted that the particular bag of cocaine found during the search was his.

¶ 58    True, McCalpine never testified that defendant said, outright, that *those* drugs were his. But consider the full context of defendant's statement. The police had just searched his house, seized cocaine, arrested him, and brought him to the station for questioning—about the cocaine (and guns) they had just seized. It is reasonable to infer that defendant, in admitting that he sold drugs, was referencing the drugs that were the basis for—and surely the focus of—the police interview.

¶ 59    Any claim that defendant knew nothing of the cocaine in his dining room is further belied by the fact that the room was full of a cocaine dealer's standard equipment. It is hard to believe that defendant admittedly sold drugs, had all of that paraphernalia lying around, and yet had no idea that there was any cocaine in that very same room. The jury could reasonably infer that he knew and indeed that the cocaine was his to sell.

¶ 60    Second, defendant argues that the State failed to "rule out" that the cocaine belonged to one (or more) of the three other people who were sitting around the table with him when the police entered the house. That was not the State's "burden," as defendant asserts. The State's "burden [was] to prove that defendant was responsible for the presence of the narcotics." *People v. Macias*, 299 Ill. App. 3d 480, 488 (1998). Others could *also* be responsible; that would be a case of *joint* possession. *Schmalz*, 194 Ill. 2d at 82 ("The rule that possession must be exclusive does not mean that the possession may not be joint ***."). So defendant's argument, at the very least, is overstated.

¶ 61    But there is a kernel of truth to it. A defendant's residency (or other proven control over the premises) generally permits the jury to infer both possession and knowledge of contraband found within the premises—but only "absent other factors which might create a reasonable doubt as to the defendant's guilt." *Smith*, 191 Ill. 2d at 413; *Alicea*, 2013 IL App (1st) 112602, ¶ 24. And in some circumstances, the control that others had over the premises, or the access they had to the contraband itself, can help create a reasonable doubt as to whether the contraband really did belong to the defendant.

¶ 62    Defendant offers a host of arguments, all variations on this general theme. In sum: The cocaine could have belonged to anyone in the house. Defendant was not the only person who lived there, and at least three other people had ready access to the common area of the house where the cocaine was found. These facts, defendant says, undermine the inference that he had "exclusive control" over the cocaine. And the cocaine was "hidden" or "secreted" in a dining-room drawer. By whom, we cannot know—and that, he says, undermines the inference that he had any knowledge of it.

¶ 63    The record does not support these factual assertions. The State presented sufficient evidence that defendant lived in the house. But we do not know if anyone else lived there with him. It is not implausible to think that someone did; after all, the house had three furnished bedrooms. But that alone does not prove that anyone else lived there or controlled the premises. (During cross-examination, defense counsel asked if McCalpine knew that other people lived in the house with defendant, but the State's foundational objection was sustained, and defense counsel did not attempt to lay a proper foundation for the question after that.)

¶ 64    Nor does the record show that anyone else in the dining room had control over the "common area" where the cocaine was found, either because they lived with defendant or for some other reason. For all we know, those people were casual visitors, with no connection to the property and certainly no proven connection to the cocaine itself. We have no basis on which to conclude that they even knew it was there. Defendant has merely shown that they were present when the cocaine was seized.

¶ 65    Defendant's arguments, in the end, are speculation: He might have had (some number of) housemates. Some of the people in the dining room might have been (among) those housemates. Either way, someone who lived there or otherwise had control over the dining room might have "hidden" the cocaine in the drawer without his knowledge. None of this even arguably shows that defendant did not have constructive possession and knowledge of the cocaine. These bare possibilities do not create a reasonable doubt about his guilt.

¶ 66    This case is unlike *People v. Wolski*, 27 Ill. App. 3d 526 (1975), one of defendant's principal authorities. There, the police searched an apartment, where Wolski lived with his brother, and found cannabis. *Id.* at 527. Wolski's conviction for possessing that cannabis was reversed on appeal. *Id.* at 529. Apart from the "bare fact" that the cannabis was found in an

apartment that Wolski shared with his brother, there was "no corroborating evidence," of any kind, linking him to the drugs. *Id.* at 528-29. Here, even if we granted defendant that other people shared control over the premises with him, the fact would still remain that he admitted to selling drugs. Thus, the inference of his knowledge and control is not based *entirely* on his residency in the house. Unlike in *Wolski*, there was clear "corroborating evidence" that further linked defendant to the cocaine.

¶ 67    Relying on *Maldonado*, 2015 IL App (1st) 131874, defendant argues that we cannot infer his knowledge of cocaine that was "hidden" or "secreted" in a dining-room drawer. In that case, Maldonado was convicted of constructively possessing a bag of heroin that was inside a "closed" "statue" in the bedroom of a house that was not proven to be his residence. *Id.* ¶¶ 4, 24-26, 41. Because there was no proof of residency or other control over the premises, and indeed no proof that Maldonado "was ever inside the building," it was unreasonable to infer that he knew about the heroin "secreted" inside a statue. *Id.* ¶¶ 40-41. But here, the cocaine was found in defendant's own dining room. In contrast to the heroin in *Maldonado*, the cocaine was not, in any meaningful way, "hidden" from defendant—no more so than, say, his silverware. Given the location of the cocaine, the nearby paraphernalia, and defendant's admission that he sold drugs, it was not unreasonable to infer that he knew about the cocaine.

¶ 68    Lastly, defendant points out that there was no physical evidence, such as fingerprints or DNA, connecting him to the cocaine. That was of course a relevant fact for the jury to consider in a possession case. See, *e.g.*, *People v. Jackson*, 23 Ill. 2d 360, 364 (1961); *People v. Tates*, 2016 IL App (1st) 140619, ¶ 26. But the absence of such forensic evidence does not, by itself, create a reasonable doubt about a defendant's possession of an item of contraband. *Hernandez*, 229 Ill. App. 3d at 551. Specifically, it does not diminish the force of the State's evidence that defendant lived in the house and admittedly sold drugs. For the reasons we have explained, the jury could reasonably infer from that evidence that defendant constructively possessed the cocaine, whether or not there was evidence of his prints (or DNA) on the packaging.

¶ 69    In sum, because it was reasonable to infer that defendant had constructive possession and knowledge of the cocaine found during the search, his conviction for possession of a controlled substance with intent to deliver—the predicate for his armed-violence conviction—is affirmed.

¶ 70                                                III

¶ 71    Defendant challenges his armed-violence conviction on one final ground. Even if he had possession of both the handgun and the cocaine, defendant argues, he did not have possession of them at the same time. In other words, he was not "armed" with the handgun "while" he possessed the cocaine, as the armed-violence statute requires. See 720 ILCS 5/33A-2(a) (West 2016).

¶ 72    It is easy to see, based on our analyses of defendant's two convictions, why this line of argument fails. To begin, defendant's armed-violence conviction was not based on his "constructive possession" of the handgun; it was based on his being "otherwise armed" with the handgun. When was he so armed? When the police entered the house. And when did he have constructive possession of the cocaine? When the police entered the house, among other times. Thus, he was "armed" with the handgun "while" he possessed the cocaine.

¶ 73    Defendant dusts off the hypothetical of the "weekend hunter," who possesses a rifle a hundred miles downstate while, at the same time, he has cocaine stashed in his home in Chicago. See *People v. Lenoir*, 125 Ill. App. 3d 260, 265-67 (1984). There must be some time

nexus in time and place between the predicate felony and the gun possession, says defendant, or this "weekend hunter" would be guilty of armed violence, an absurd result.

¶ 74   But even if defendant is correct that some nexus of time and place is required by the armed-violence statute, that nexus was surely present here. At the moment that defendant had "immediate access to or timely control over" his weapon (emphases omitted) (*Condon*, 148 Ill. 2d at 110), he was in possession of the narcotics—they were only a few feet away from him. The hypothetical outer limits of the armed-violence statute are not presented here, and we need not explore them. Defendant's armed-violence conviction is affirmed.

¶ 75                                                        IV

¶ 76   Defendant claims that McCalpine's opinion testimony about the uses of plastic bags, blenders, and inositol in the drug trade was inadmissible. That testimony was not *lay* opinion, he says, since it was based on McCalpine's "training and experience" as a drug investigator. But McCalpine was never tendered by the State, or accepted by the trial court, as an *expert* in drug distribution. Thus, the State failed to lay a proper foundation for his opinion testimony. And those opinions, defendant argues, were critical to the State's proof that he intended to sell the cocaine.

¶ 77   Because defense counsel did not object to McCalpine's testimony, defendant advances theories of plain error and ineffective assistance of counsel. On either theory, the threshold question is whether McCalpine's testimony about the paraphernalia was admissible as a lay opinion. We review the trial court's determination for an abuse of discretion. *People v. Thompson*, 2016 IL 118667, ¶ 49.

¶ 78                                                        A

¶ 79   Rule 701 of the Illinois Rules of Evidence sets forth the foundational requirements for an "opinion" or "inference" offered by a witness who is not testifying as an expert. Ill. R. Evid. 701 (eff. Jan. 1, 2011). First, it must be "rationally based on the perception of the witness." *Id.* This provision simply restates "the general requirement that a witness must have personal knowledge of the matter to testify to it." *People v. Novak*, 163 Ill. 2d 93, 102-03 (1994); *People v. Terrell*, 185 Ill. 2d 467, 497 (1998); see Ill. R. Evid. 602 (eff. Jan. 1, 2011). The opinion or inference must also be "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 80   Rule 702, in turn, sets forth the foundational requirements for expert opinion testimony. It provides in relevant part that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 81   A witness may thus testify as an expert if he or she "has knowledge and experience beyond the average citizen that would assist the jury in evaluating the evidence." *Novak*, 163 Ill. 2d at 104. There is no particular way in which that expertise had to be acquired; it could have come through formal "study, training, or research," or through "practical experience" in the relevant specialized field. *Id.*

¶ 82 Rules 701 and 702, like the federal rules on which they are "modeled" (*Thompson*, 2016 IL 118667, ¶ 40), do "not distinguish between expert and lay witnesses but rather between expert and lay testimony." (Emphases omitted.) Fed. R. Evid. 701 advisory committee's note to 2000 amendment. Thus, a witness can qualify as both a lay fact witness and an expert witness—or more precisely, can offer both lay and expert testimony—in the same case. And an expert *may* base an opinion (as a lay witness *must*) on facts that the expert has personally observed. Ill. R. Evid. 703 (eff. Jan. 1, 2011).

¶ 83 Law-enforcement officers are especially likely to serve as such dual-capacity witnesses. It is routine for officers with special expertise in the kind of criminal activity that is afoot to be "personally involved in the factual underpinnings of the case." (Internal quotation marks omitted.) *United States v. Christian*, 673 F.3d 702, 709 (7th Cir. 2012). They might, for example, participate in the execution of a search warrant, as here. Because their observations will be "guided by experience and training," the inferences and opinions they arrive at in the field "cannot always be separated from the expertise they bring" to bear. *Id.* As a result, "at least some of their fact testimony will be influenced by [their] specialized knowledge." *Id.*

¶ 84 Defendant's challenge to McCalpine's testimony requires us to draw a boundary between a law-enforcement officer's potential roles as fact and expert witness. As far as we know, from the briefs and our own research, no Illinois court of review has probed that boundary in the context of facts similar to those presented here. But several federal courts have. And because Rule 701 is substantively identical to its federal counterpart, our supreme court has instructed that we may turn to federal case law for guidance. *Thompson*, 2016 IL 118667, ¶ 40.

¶ 85 A case closely on point is *United States v. Oriedo*, 498 F.3d 593 (7th Cir. 2007). In that case, a federal agent testified that small plastic bags " 'with the corners cut off' " were found during a search of the defendant's hotel room. *Id.* at 602. The government asked the agent to explain to the jury the " 'significance' " of those plastic bags, or " 'how [they] are used.' " *Id.* The agent testified, " '[t]hat's usually the way drug dealers will package the crack cocaine for resale.' " *Id.* When the defense objected that the agent had not been disclosed as an expert, the government rephrased its question and asked the agent how, "based on his own observations," crack cocaine is packaged for sale. *Id.* at 602-03. The agent explained that drug dealers typically cut or tear the corner of a small bag, put the drugs into the corner piece, and close it up with a twist tie, a knot, or a heat seal. *Id.* at 603.

¶ 86 The Seventh Circuit held that, although the agent's testimony was "ostensibly couched as a matter of [his] direct observation," it was nonetheless expert testimony as to "matters within [his] experience observing narcotics trafficking practices." *Id.* The agent's *lay* opinion testimony, the court explained, had to be "limited to what he observed in the search or to other facts derived exclusively from this particular investigation." *Id.* But the agent's testimony was not so limited. To the contrary, the agent "brought the wealth of his experience as a narcotics officer to bear on those observations and made connections for the jury based on that specialized knowledge." *Id.* For that reason, the agent offered expert opinion testimony within the scope of Rule 702. See *id.*

¶ 87 *Oriedo* exemplifies the general framework fashioned by the Seventh Circuit, and adopted widely throughout the federal courts, for distinguishing between an officer's potential roles as lay fact witness and expert witness in the context of a narcotics investigation. That framework, in our view, articulates a clear and workable line, consistent with the meaning and purpose of

Rules 701 and 702, between those roles. It is worth spelling out the distinction a bit further, in more generally applicable terms.

¶ 88 An officer testifies as a lay fact witness when the officer testifies, based on personal knowledge, about the events at issue—either the charged offense itself, or law enforcement's investigation of the offense. In this context, an officer may, of course, offer any relevant and helpful lay opinions. To count as lay opinions, they must be based on the officer's personal observations of the underlying events, and they cannot require the officer to draw on any specialized knowledge or expertise. They must be opinions that anyone in the same position, not just a trained officer, would have been qualified to offer. *United States v. Jones*, 739 F.3d 364, 369 (7th Cir. 2014); Fed. R. Evid. 701 advisory committee's note to 2000 amendment (lay opinion must result from "a process of reasoning familiar in everyday life" (internal quotation marks omitted)).

¶ 89 But when an officer testifies to opinions that are "based upon the officer's experience over the years in narcotics investigation" (*Jones*, 739 F.3d at 369), then the officer no longer serves as a fact witness offering lay testimony. If the opinion rests " 'in any way' " on the officer's specialized knowledge, it is expert testimony, and it must meet the foundational requirements of Rule 702. *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (quoting 4 Weinstein's Federal Evidence § 701.03[1]); see also Fed. R. Evid. 701 advisory committee's note to 2000 amendment ("any part" of witness's testimony based on specialized knowledge is governed by Rule 702). That will be the case, for example, when the officer testifies about drug-distribution practices *in general*, because that requires the officer to bring his or her specialized experience to bear on what was observed during the investigation of the crime.

¶ 90 Another example may help to illustrate the distinction. It is not unusual for an officer to testify to the meaning of code words used in a drug transaction. Depending on the basis for the officer's opinion testimony, it may be either a lay or an expert opinion. It is a lay opinion if it is based *entirely* on the officer's firsthand interactions with the participants and observations of how *they* used the code words at issue when planning or executing drug transactions. *Jones*, 739 F.3d at 369. When that is the case, the officer's opinion results not from a specialized skill but simply from his or her ability to catch on to new or invented uses of language by observing them in context. That is a perfectly ordinary human ability, one that any parent of a preschooler relies on day in and day out. An untrained ear is enough.

¶ 91 But if the officer formed an opinion as to the meaning of the code words by relying on his or her experience in drug investigations more broadly, it is an expert opinion. *Id.* In other words, it is an expert opinion if the officer knows, from investigating *other* transactions or conspiracies, that certain words, while seemingly innocuous to the untrained ear, generally bear hidden meanings when they are used in certain situations. *United States v. York*, 572 F.3d 415, 420 (7th Cir. 2009); see also *Jones*, 739 F.3d at 369; *United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011) (Kavanaugh, J.) (testimony about operations of drug conspiracy is lay opinion if based on agent's personal knowledge of "that drug conspiracy" but expert opinion if based on experience "with other drug conspiracies" (internal quotation marks omitted)). When the officer relies on his or her experience with other drug transactions or conspiracies, the opinion is based, at least in part, on the officer's knowledge of the general practices of drug dealers. And that is specialized knowledge, within the meaning of Rules 701 and 702.

¶ 92 We will apply this framework to McCalpine's opinion testimony. McCalpine testified, in particular, that small plastic bags (of which defendant had several hundred) are commonly used

to package narcotics, that blenders (of which defendant had two) are commonly used to blend and cut heroin, and that inositol (a bottle of which was found in the box with other paraphernalia) is a dietary supplement commonly used to "multiply," or cut, cocaine.

¶ 93    We begin with McCalpine's testimony about the plastic bags. The State asked him, "In your experience, can you tell the ladies and gentlemen of the jury what these baggies are commonly used for?" McCalpine answered, "To package narcotics."

¶ 94    In offering this opinion, McCalpine did not serve as a lay fact witness, whose purpose was merely to inform the jury of what he observed during the events in question. As in *Oriedo*, 498 F.3d at 602-03, the purpose of McCalpine's testimony was to educate the jury about drug-distribution practices *in general*, so that the jury could use that knowledge to assess what defendant may have intended to do with the cocaine. McCalpine thus relied on knowledge and expertise that he had acquired in *other* investigations, in the course of his specialized training, or some mix of the two. These are the hallmarks of expert testimony.

¶ 95    And as in *Oriedo*, McCalpine's testimony about the plastic bags was "ostensibly couched" in terms of his personal knowledge—his "experience" (as the State said) or "observations" (as the government said in *Oriedo*)—of how plastic bags are used to package drugs for sale. See *id.* We have no reason to doubt that McCalpine had previously seen drugs packaged for sale in small plastic bags. But that did not automatically make his testimony a lay opinion; personal knowledge can be part of the foundation for an expert opinion, too. See Ill. R. Evid. 703 (eff. Jan. 1, 2011). That was the case in *Oriedo*: The agent's past observations of the use of corner-cut plastic bags in drug distribution were part of his specialized experience as a narcotics officer, and he drew on the knowledge he acquired in the course of that experience to explain to the jury how plastic bags of the kind found in the search are connected to the drug trade in general. And that is why his opinion, despite having an admitted element of personal knowledge, was still an expert, rather than a lay, opinion. So too here.

¶ 96    One might try to distinguish McCalpine's testimony about the plastic bags from the agent's testimony in *Oriedo* as follows. The agent identified a particular feature of the bags found during the search—the clipped corners—that associated them with the drug trade. *Oriedo*, 498 F.3d at 602-03; see also *United States v. Navarro*, 90 F.3d 1245, 1250, 1261 (7th Cir. 1996) (agent's testimony about "corner-cut plastic baggies" was expert testimony used to explain cocaine trade to jury). Elaborating on that point, the agent then explained some of the technical details of the process of packaging drugs for sale. *Oriedo*, 498 F.3d at 602-03. But McCalpine's testimony, one might argue, lacked these technical details, and thus was too thin and nonspecific to convey any technical or specialized knowledge, as opposed to a commonly known fact.

¶ 97    But we have rejected the premise of this argument before, in holding that jurors are not expected to "have any expertise on cocaine distribution." *People v. Abdelmassih*, 217 Ill. App. 3d 544, 548 (1991); see also *United States v. Glover*, 479 F.3d 511, 516 (7th Cir. 2007) (the "nature of narcotics trafficking is likely to be outside the knowledge of the average layman" (internal quotation marks omitted)). We cannot presume that jurors know how drugs are packaged for sale, much less that "these baggies"—that is, the kinds of plastic bags found in defendant's dining room—were consistent with the general practices of cocaine dealers. And that (at least on a slightly charitable reading) was the gist of McCalpine's testimony. So while McCalpine conveyed less specialized or technical knowledge than the agent in *Oriedo*, he still conveyed *some*. This case may be a closer call than *Oriedo* for that reason, but the outcome is

the same. McCalpine still crossed the line into expert territory when he educated the jury about the general practices of cocaine dealers.

¶ 98     And even if we are wrong about the plastic bags, the rest of McCalpine's testimony *clearly* crossed the line into expert territory. Take McCalpine's testimony that inositol is a common cutting agent for cocaine. No doubt *that* is specialized, technical knowledge, and a fact unknown to the average person. See *Navarro*, 90 F.3d at 1261 (agent's testimony about use of inositol in drug trade was expert testimony).

¶ 99     We do not dispute that McCalpine, an experienced narcotics investigator, possessed this knowledge. But it is simply not plausible, as the State asserts, that his knowledge was based on his own "personal experience and observations." For what it is worth (which is not much), that may be true of his knowledge that cocaine is sold in small plastic bags; in all likelihood, as we noted above, he has seen actual cocaine packaged that way. But has he ever observed, with his own eyes, that the final, packaged product sold by a drug dealer was a mix of cocaine and inositol? How could he have observed *that* in the field? You cannot just look at the bag; the determination requires laboratory analysis by a forensic chemist, and there is no suggestion that McCalpine had any competence whatsoever in that field.

¶ 100    So McCalpine could not offer a lay opinion about the use of inositol as a cutting agent; it is implausible to assume that he had the necessary foundation in personal knowledge to do so. See Ill. Rs. Evid. 602, 701(a) (eff. Jan. 1, 2011). Rather, his knowledge of inositol had to come from his specialized *training*, rather than his personal observations, in narcotics investigation. To be clear, there is nothing wrong with an officer acquiring knowledge that way. But professional training is only a proper foundation for *expert* testimony. See Ill. Rs. Evid. 602, 701, 702 (eff. Jan. 1, 2011); see also *Novak*, 163 Ill. 2d at 103 (personal knowledge cannot be based on other people's statements). And that is exactly what McCalpine offered, albeit without having been tendered or accepted as an expert.

¶ 101    The same is true for McCalpine's testimony about the use of blenders to process heroin for sale. And as defendant points out, that testimony was also irrelevant, because he was not charged with possessing or selling heroin and there was no evidence that any heroin was found during the search. Defendant was only charged with possessing *cocaine* with the intent to sell it.

¶ 102    The State makes two final points, neither of which we accept. First, the State agrees that McCalpine's testimony about the paraphernalia was admissible as an expert opinion but goes on to argue that it was *also* admissible as a lay opinion. That is impossible.

¶ 103    It is commonplace, as we have explained, for law-enforcement officers to testify as dual-capacity *witnesses*. But there is no such thing as dual-capacity *testimony*. Any given piece of testimony is either lay or expert testimony; it cannot be both. Rule 701 says this plainly: Lay opinions and inferences are "limited to" those which are "*not* based on scientific, technical, or other specialized knowledge *within the scope of Rule 702*." (Emphases added.) Ill. R. Evid. 701(c) (eff. Jan. 1, 2011). If an opinion falls within the scope of Rule 702, it is "by definition outside of Rule 701." *Smith*, 640 F.3d at 365.

¶ 104    Second, the State says that McCalpine's testimony was a lay opinion because his knowledge of drug paraphernalia was within "the common knowledge of anyone who regularly deals with narcotics crimes." Perhaps it was. But by the same logic, one could say that the molecular structures of substances are within the "common knowledge of anyone who regularly deals with" mass spectroscopy. Does that mean a forensic chemist can offer a *lay*

opinion that a substance was cocaine? Of course not. The fact that something is common knowledge among specialists in a field does not mean that those specialists can testify to their knowledge as a lay opinion. That would leave no room at all for any meaningful distinction between lay and expert testimony.

¶ 105    In sum, McCalpine's testimony about the paraphernalia was not admissible as lay opinion testimony. And his testimony about the blenders was irrelevant to boot.

¶ 106    As McCalpine was never tendered by the State, nor accepted by the trial court, as an expert in drug distribution, the admission of this testimony as lay opinion was error.

¶ 107                                             B

¶ 108    Our next question is what effect, if any, the error had on the outcome of defendant's trial. As explained below, we find that the error was harmless. Thus, defendant cannot show either first-prong plain error by the trial court, in admitting McCalpine's testimony as a lay opinion, or ineffective assistance of counsel, based on his attorney's failure to object to its improper admission.

¶ 109    We will circle back to defendant's point that the testimony about processing heroin with blenders was irrelevant. For now, we will focus on the improper admission of McCalpine's testimony as a lay opinion.

¶ 110    When testimony is improperly admitted as a lay opinion, the error is harmless if the witness was, in fact, qualified as an expert and thus would have been accepted as an expert by the trial court if so tendered. See *Novak*, 163 Ill. 2d at 98-104 (testimony not admissible as lay opinion was admissible as expert opinion where witnesses, though not tendered as experts, were qualified); accord *Smith*, 640 F.3d at 366 (same).

¶ 111    Defendant never argues that McCalpine's testimony would not have been admissible as an expert opinion. (Quite the contrary.) He does not challenge the substance of the testimony, and, more importantly, he does not challenge McCalpine's qualifications, which the State elicited at trial. In sum, McCalpine had 5 years of specialized experience as a narcotics investigator and 12 years in total, as an officer. He had completed the Chicago Police Academy's specialized training in narcotics investigation, and he participated in ongoing, annual training in his field. McCalpine was qualified to opine about the general practices of cocaine distribution. That testimony should not have been admitted as a lay opinion, but the error was clearly harmless.

¶ 112    "[I]f an error was harmless, it most certainly cannot rise to the level of plain error." *People v. Leach*, 2012 IL 111534, ¶ 141. For the same reasons, defendant cannot show that he was prejudiced by counsel's failure to object to the admission of McCalpine's testimony as a lay opinion.

¶ 113    In fact, defendant cannot even show that counsel was deficient. An objection from the defense surely would have prompted the State to remedy its error and tender McCalpine as an expert. (The most reasonable inference, from the fact that the State elicited his qualifications and thus laid a foundation for his expert testimony, is that the State's failure to formally tender him as an expert was an oversight.) He was qualified, and thus we are confident that the trial court would have accepted him as an expert, in a process that would have unfolded before the jury's eyes. An objection would only have served to highlight McCalpine's qualifications and

ultimately to endow his opinions with the full weight of expert testimony. Defense counsel could have reasonably decided to leave well enough alone.

¶ 114    The error was also harmless because the State easily proved that defendant intended to sell the cocaine. This is true even without considering McCalpine's opinion testimony or, for that matter, any common-sense inferences that lay jurors may have drawn from some of the paraphernalia evidence (such as the measuring spoons and scales), with or without expert testimony to further educate them about drug distribution practices.

¶ 115    McCalpine also testified—as a fact witness—that defendant admitted he sold drugs during his interview at the station. No doubt a jury would have taken defendant's own words as clear proof of his intent. Defendant's admission alone shows that the evidence was not closely balanced and that any error (by the trial court or defense counsel) cannot plausibly be blamed for his conviction.

¶ 116    Defendant responds to this evidence by trying to call McCalpine's credibility into question. McCalpine was impeached, he says, on the "critical" issue of which chair the gun was on—a harmless discrepancy, for the reasons we have explained, and one that McCalpine acknowledged in his testimony. And McCalpine neglected to inventory or photograph the clothes that allegedly sized up to defendant's unusual stature. But defendant never convincingly explains how any of this would give a reasonable juror grounds to think that McCalpine flat-out lied about defendant's admission to the police. What is more, defendant's point seems to be that the State's *failure* to tender McCalpine as an expert somehow *bolstered* his credibility on an unrelated issue of fact. Suffice it to say that we cannot make any sense of this logic.

¶ 117    Defendant makes two final points in claiming prejudice by the improper admission of McCalpine's testimony as a lay opinion. First, he says, McCalpine's testimony was especially prejudicial because it "went to" the "ultimate question" of his intent to sell the cocaine. Our supreme court has held "that a witness, whether expert or lay, may provide an opinion on the ultimate issue in the case." *Terrell*, 185 Ill. 2d at 496. In any event, McCalpine did *not* offer an opinion on the ultimate issue of defendant's intent. He testified as to how plastic bags, blenders, and inositol are used in the drug trade. That provided circumstantial evidence of defendant's intent, but it was not an opinion as to what defendant's intent actually was. See *Abdelmassih*, 217 Ill. App. 3d at 548.

¶ 118    Second, defendant claims that the evidence was close because the jury (about three hours into its deliberations and about an hour before it reached its verdicts) sent a note to the trial judge saying, "hung jury. 10 to 2." But "the mere fact that the jury indicated in one note that it could not reach a decision does not render the evidence closely balanced." *People v. Cotton*, 393 Ill. App. 3d 237, 260 (2009). And "hung" on which count? The cocaine charge, armed violence, or both? We cannot know, and neither can defendant. Thus, we cannot infer anything from this note about the jury's view of the evidence relevant to the cocaine charge.

¶ 119    For these reasons, the improper admission of McCalpine's testimony as a lay opinion does not entitle defendant to a new trial.

¶ 120    We reach the same conclusion regarding McCalpine's irrelevant testimony about the use of blenders to process heroin for sale. Defendant's admission that he sold drugs all but ensured the jury's finding that he intended to sell the cocaine in his dining room. This one fleeting comment, to which the State never returned in its proofs or its closing argument, caused

defendant minimal prejudice, if any. Though its admission was improper, the blender testimony does not entitle defendant to relief.

¶ 121　　Last, defendant flatly asserts, without reasoned argument or citation to relevant authority, that these errors were reviewable as second-prong plain error. Defendant's one cited case says nothing of the kind. *People v. Brown*, 232 Ill. App. 3d 885, 898 (1992) (reversible error to let officer, whose expert testimony was offered to establish street value, to stray into detailed discussion of "habits" and "practices" of drug dealers). It was defendant's burden to establish plain error. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). This conclusory assertion does not come close.

¶ 122　　In sum, the errors in admitting (or failing to object to) McCalpine's opinion testimony, on foundational and relevance grounds, do not entitle defendant to a new trial.

¶ 123　　　　　　　　　　　　　　　　　　　V

¶ 124　　Defendant contends, and the State concedes, (1) that the trial court erred in ordering that he must serve his sentence for armed violence at 85%, rather than 50%, time and (2) that this error, although forfeited, may be reviewed on appeal as second-prong plain error.

¶ 125　　Except as otherwise provided by statute, a prisoner "shall receive one day of sentence credit for each day of his or her sentence." 730 ILCS 5/3-6-3(a)(2.1) (West 2016). For the offense of armed violence, the truth-in-sentencing statute provides that a prisoner "shall receive no more than 4.5 days of sentence credit for each month of his or her sentence" if the court "has made and entered a finding *** that the conduct leading to conviction *** resulted in great bodily harm to a victim." *Id.* § 3-6-3(a)(2)(iii).

¶ 126　　The trial court never made a finding of great bodily harm. And there was no evidence that anyone was harmed at all, much less that anyone suffered great bodily harm, during the course of the offense. Thus, the trial court's order that he serve his sentence at 85% time, rather than 50% time, was error. Defendant was eligible to receive day-for-day credit on his sentence. See *People v. Harris*, 2012 IL App (1st) 092251, ¶ 22.

¶ 127　　We appreciate and accept the State's concession that the order was error. And we agree with the parties that the trial court's misapplication of the truth-in-sentencing law amounted to second-prong plain error because it affected defendant's fundamental right to liberty. See, *e.g.*, *People v. Smith*, 2016 IL App (1st) 140496, ¶ 15. Indeed, it increased the minimum amount of time that he will have to spend in prison by more than five years. Alternatively, as defendant also contends, his attorney was ineffective for failing to raise this clear and obvious error. We are confident that the trial court would have corrected the error, had it been raised below at the appropriate time.

¶ 128　　We correct defendant's mittimus to reflect that he is eligible to receive day-for-day credit and is thus eligible for early release after serving 50% of his sentence for armed violence. See Ill. S. Ct. R. 615(b)(1); *People v. Walker*, 2011 IL App (1st) 072889-B, ¶ 40 (reviewing court may correct mittimus without ordering remand).

¶ 129　　　　　　　　　　　　　　　　　　　VI

¶ 130　　Defendant argues, for the first time on appeal, that the trial court imposed certain improper monetary assessments and failed to offset others by his $5-per-day credit for time served in presentence custody.

¶ 131 Illinois Supreme Court Rule 472 provides that the circuit court retains jurisdiction to correct certain sentencing errors, including errors in the imposition of monetary assessments or in the application of *per diem* credits, at any time following judgment. Ill. S. Ct. R. 472(a)(1)-(2) (eff. May 17, 2019). Rule 472(e) provides that where, as here, a criminal case was pending on appeal as of March 1, 2019, and a party raised sentencing errors covered by Rule 472 for the first time on appeal, "the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019). Thus, pursuant to Rule 472(e), defendant must first file a motion in the circuit court requesting the correction of the errors alleged here. *People v. Whittenburg*, 2019 IL App (1st) 163267, ¶ 4. We remand to the circuit court for that limited purpose.

¶ 132                                    CONCLUSION

¶ 133 We affirm defendant's convictions and sentence. We reverse the circuit court's order requiring defendant to serve his sentence at 85%, rather than 50%, time, and we correct the mittimus accordingly. We also remand to the circuit court to allow defendant to file a motion pursuant to Rule 472 challenging his monetary assessments and *per diem* credits.

¶ 134 Affirmed in part, reversed in part, mittimus corrected, and remanded.