2020 IL App (1st) 171441-U

No. 1-17-1441

Order filed August 5, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 20315 |
| | ) | |
| ROLLEN LIGON, | ) | Honorable |
| | ) | Thomas V. Gainer, Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ELLIS delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for possession of a controlled substance affirmed where evidence was sufficient to establish his constructive possession of the drugs.

¶ 2    After a bench trial, defendant Rollen Ligon was convicted of possessing 0.1 grams of cocaine (see 720 ILCS 570/402(c) (West 2014)) and sentenced to 18 months on probation. The only appellate issue is whether the State proved beyond a reasonable doubt that he constructively possessed the cocaine. Finding sufficient evidence of constructive possession, we affirm.

¶ 3     On the evening of November 12, 2015, Chicago police officers Ferenzi, Zarbock, White, Stipanov, and others executed a search warrant at a two-flat apartment building on the south side. Their testimony, in sum, established the following.

¶ 4     The building had two common exterior entrances, one in the front and one in the back, and a common stairwell inside. Each of the two units had its own interior entrance and could not be accessed directly from the other unit. The subject of the warrant was the first-floor apartment. It had two bedrooms, including one in the rear of the unit, where the cocaine was found.

¶ 5     While "attempting to gain entry" to the building, through the front entrance, Firenzi saw an "unknown" black male look out "the first floor rear window" and then run up the stairwell. The SWAT team made a forced entry (as it turned out, the door was barricaded), and Firenzi and some other officers went inside. An unidentified woman met them on the first floor. Defendant and two unidentified men, including the one who had been looking out the window, came out of the upstairs apartment and walked down the stairs. Officers escorted the three men into the first-floor apartment and detained them there during the search. By the time Zarbock, White, or Stipanov came inside, defendant was already detained. He did not have any weapons or drugs on his person. As Zarbock recalled, defendant was handcuffed.

¶ 6     During the search, another officer alerted Zarbock to a plastic tote in the rear bedroom. On top of the tote, Zarbock found a plastic bag with five small, knotted plastic bags inside of it, each containing a white rock-like substance. Forensic analysis by the Illinois State Police later confirmed the presence of 0.1 grams of cocaine.

¶ 7     Strewn about on the floor in the rear bedroom, close to the plastic tote where the drugs were found, were men's slippers and clothing, and a piece of mail addressed to "Rollen Ligon,"

at apartment "1A" of the building in question. Zarbock described the mailing, both in court and on the police inventory sheet, as a "church advertisement." The mailing, which was admitted into evidence, was a letter from Saint Matthew's Church. It was dated "November 2015," the same month as the search. Among other things, it solicited donations from the "Saint Matthew's Churches' Prayer Family." At various points, it referred to defendant as "Brother Rollen."

¶ 8    Several photos of the cocaine, the tote, and the surrounding items in the bedroom were also admitted into evidence. One photo shows a well-worn prayer book, bearing an insignia from Saint Matthew's Church, on top of the tote with the cocaine, a mirror, and a razor blade (among other items).

¶ 9    During the search, defendant said he was cold and asked for a coat. White found one in the rear bedroom closet. It was the only coat in that closet, and there was no name or other identifying information anywhere inside it. But White did find $551 in cash in a pocket. White gave the coat (minus the money) to defendant, who continued to wear it when he was taken to the police station.

¶ 10    Once the cocaine and money were seized from the bedroom, defendant was formally placed under arrest. Stipanov read him his *Miranda* rights. Defendant then spontaneously asked, "Did you find them guns?" Stipanov said no and asked defendant where the guns could be found. Defendant said they were in the basement, which could only be accessed from the outside of the building. Defendant and Stipanov made their way outside toward the basement. Along the way, defendant gave Stipanov his keys, one of which Stipanov used to open the basement door. Inside the basement, defendant kicked off the front panel of the furnace and said the guns were on the right. Stipanov reached into the furnace and found two loaded handguns.

¶ 11    Stipanov did not inventory the keys (and as a result, they were not in evidence) because they "were [defendant's] personal keys to enter the residence, so if he was released after being in custody he would have access back to his home." Defense counsel asked Stipanov if the key that opened the basement door was "the same key used to enter his apartment or was that a different key?" Stipanov responded, without any further explanation, that it was a different key.

¶ 12    The trial court found defendant guilty of possession of a controlled substance but not guilty of other charges (including various gun-possession charges and criminal fortification of a residence). In the trial court's view, the keys, the piece of mail, and the coat were sufficient to prove that defendant resided in and had control over the rear bedroom of the first-floor apartment and therefore constructively possessed the cocaine that was found there.

¶ 13    In reviewing the sufficiency of the evidence, we must ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). We must draw all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. The trier of fact's determinations regarding the credibility of the witnesses, the weight of the evidence, and the resolution of any conflicts in the evidence are entitled to great deference, but they are not conclusive. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009); *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 14    To prove the charge of possession of a controlled substance, the State had to prove that "defendant had knowledge and possession of the drugs." *People v. Givens*, 237 Ill. 2d 311, 334-35 (2010); see 720 ILCS 570/402(c) (West 2014). The State's theory, both at trial and on appeal, is that defendant had knowledge and constructive possession of the cocaine because it was found

in his residence, and more specifically, in his bedroom.

¶ 15    Possession is constructive, as the State alleged here, when a defendant has the "intent and capability to maintain control and dominion" over an item of contraband, though he does not have immediate personal control of it. *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992). The intent (and capability) to control the *item* can be inferred when the defendant "exercised immediate and exclusive control" over the *area* where that item was found. *People v. Maldonado*, 2015 IL App (1st) 131874, ¶ 23. And control over the area generally can be inferred when the area is within the defendant's residence. *Id.* ¶ 29; *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17.

¶ 16    We note, at the outset, that the police never saw defendant in the first-floor apartment, much less the rear bedroom of that two-bedroom unit. To the contrary, defendant was in the *upstairs* apartment when Firenzi and the SWAT team entered the building. Nor did the police find a current identification, lease, or utility bill listing the first-floor unit as defendant's address. Even so, the State argues, defendant's keys, the mail from Saint Matthew's Church, and the coat in the closet were sufficient to link defendant to the bedroom where the cocaine was found.

¶ 17    The evidence did establish that defendant had a key to at least one common area of the building. Stipanov, whom the trial court found credible, testified that he used one of the keys defendant gave him to open the door to the basement. A defendant's possession of keys to a residence, while not conclusive, is at least some evidence that the residence is his. See *People v. Fernandez*, 2016 IL App (1st) 141667, ¶ 21; *People v. Cunningham*, 309 Ill. App. 3d 824, 827 (1999). So there is at least some evidence that defendant lived in the building.

¶ 18    But in which apartment? The State contends—and the trial court found—that defendant had a key to the first-floor apartment. Stipanov's testimony, we are told, established this fact. But

Stipanov said no such thing. He said that he did not inventory defendant's keys because they "were his personal keys to enter the residence, so if he was released after being in custody he would have access back to his home." Stipanov's phrase—"the residence"—said nothing about *which* apartment was defendant's. Nor did his testimony, in response to defense counsel's question, that the basement and apartment keys were different. What's more, it is clear from the officers' testimony as a whole that Stipanov did not use a key to enter the first-floor apartment in the first instance. If he did so at some other time, he certainly did not say so in his testimony.

¶ 19    Thus, Stipanov's testimony did not establish that defendant had a key to the first-floor apartment. For all this testimony showed, defendant could have been living in the upstairs apartment, where the police first found him. To link him to the first-floor unit, and more specifically the rear bedroom of that unit where the cocaine was found, something more than defendant's keys is needed.

¶ 20    The State's strongest evidence in this regard is the piece of mail found on the floor of the bedroom. It was a recent mailing, dated the same month of the search, addressed to defendant in "Apartment 1A" of the building in question. (There was only one unit on the first floor.) So far, so good, for the State. But because it was just a "church advertisement," defendant argues, it had the evidentiary value of junk mail, which is to say, none at all. See *Maldonado*, 2015 IL App (1st) 131874, ¶ 28.

¶ 21    The mailing was, in short, a request for donations to Saint Matthew's Church. So it could fairly be described as a solicitation, although "advertisement" might be a bit of a stretch. But it was not a random solicitation, like true junk mail—for example, an offer of goods or services sent out *en masse* and, as an inevitable result, to countless people who have not lived at the

destination addresses for some time. To the contrary, the resident of the bedroom where this mailing was found had an established connection to the church that sent it. The letter, admittedly a form letter, was directed to the "Saint Matthew's Churches' Prayer Family." At various points, it referred to defendant as "Brother Rollen." And tellingly, in the same bedroom, right next to the cocaine, was a well-worn prayer book bearing an insignia from Saint Matthew's Church.

¶ 22    The evidence as a whole thus shows that this was a targeted mailing from defendant's church, not a piece of random junk mail. It supports an inference that defendant, the addressee of the mailing, resided where that mailing was found. See *id.* ¶ 29.

¶ 23    The final piece of evidence on which the State relies is the jacket found in the bedroom closet, or more precisely, defendant's failure to object that the jacket was not his or that it did not fit him properly before wearing it to the police station. We do not agree that defendant's silence on this matter is meaningful evidence of his residency.

¶ 24    But we need not linger on this point. Putting this evidence aside, the combination of the keys and the mail is sufficient, if only barely, to prove defendant's residency. He had keys to common areas of the building. His mail—real mail, not junk mail—was addressed to him in the first-floor unit. It would be a notable coincidence if the bedroom where that opened mail was found, alongside a prayer book from the same church that sent the mail, was *not* defendant's bedroom. The trier of fact could reasonably find that it was.

¶ 25    A defendant's residency generally permits the trier of fact to infer both (constructive) possession and knowledge of contraband found within the premises—but only "absent other factors which might create a reasonable doubt as to the defendant's guilt." *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 61 (quoting *People v. Smith*, 191 Ill. 2d 408, 413 (2000)); *People v.*

*Alicea*, 2013 IL App (1st) 112602, ¶ 24. In some circumstances, for example, the control that others had over the premises, or the access they had to the contraband itself, can help create a reasonable doubt as to whether the contraband really did belong to the defendant, notwithstanding where it was found.

¶ 26     In this vein, defendant points out that the police encountered people other than him in the building. And he cites *Fernandez*, 2016 IL App (1st) 141667, ¶ 21, for the proposition that the presence of these "unidentified" people "weighs against a finding that [the defendant] maintained control over the premises." In other words, their presence suggests the possibility that the cocaine belonged to someone else.

¶ 27     That inference goes too far. It would be one thing if, for example, someone else was in the bedroom when the police arrived. That might raise a reasonable doubt about whose cocaine was found there—did it belong to the resident of the bedroom, or did the visitor drop it there after seeing the police and fleeing? But that is not what happened here. There is no evidence that anyone else was in that bedroom when the police arrived. And the placement of the cocaine does not suggest that it was randomly or hastily dropped where it was found. Sitting right next to it, on top of the tote, was a mirror and a razor blade (among other items).

¶ 28     Of course, it is *possible* that someone else left not only their cocaine but also their paraphernalia in that bedroom. But the State was not required to rule out these bare possibilities, nor was the trier of fact required "to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Hall*, 194 Ill. 2d 305, 332 (2000). Viewing the evidence in the light most favorable to the State, we do not find these possibilities sufficient to overturn the trial court's judgment.

¶ 29    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 30    Affirmed.